David P. VALENTINE,[b]
Plaintiff-Appellant,

v.

MOBIL OIL CORP.,
Defendant-Appellee.

No. 85–2029.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 14, 1986.

Decided May 19, 1986.

As Amended May 30, 1986.

Ronald W. Meyer, Phoenix, Ariz., for plaintiff-appellant.

N. Warner Lee, Michael C. Cox, Ryley, Carlock & Applewhite, Phoenix, Ariz., for defendant-appellee.

Before POOLE, BEEZER and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge.

We consider whether, under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. (the PMPA), an oil company may decline to renew a gas station franchise because the franchisee will not consent to alterations in the structure and operation of the station.

### Facts [1]

For the past ten years David Valentine has operated a gas station in Scottsdale, Arizona, under successive leases and retail-dealer contracts with Mobil. These agreements constitute a franchise relationship as defined by the PMPA. 15 U.S.C. § 2801(2).

Valentine operates what is known as a full-service gas station. In addition to selling gasoline and automobile accessories, he also repairs and services cars. The repair and maintenance operation, known as the back room, generates approximately half of Valentine's income. He has spent over $50,000 to equip his back room.

Another type of gas station, known as a pumper, is becoming prevalent in the industry. Gasoline is sold only to those motorists willing and able to pump it themselves. No one repairs cars or sells automotive products, so there is no back room. Instead, there is generally a convenience store where groceries and sundries are sold.

Valentine's most recent franchise ran from September 1, 1980, to August 31, 1983. In April 1983, Mobil offered to renew Valentine's franchise. The proposed franchise agreement contained changes in rent and hours of operation, as well as a "redevelopment rider" giving Mobil sole discretion to "mak[e] a substantial redevelopment of the premises which may include a change in configuration, and may include the elimination of the service bays." On April 27, 1983, Valentine rejected the redevelopment rider and suggested alternate

hours of operation and a different way to calculate rent. Valentine maintains, however, that if Mobil had deleted the redevelopment rider, he would have accepted the remaining terms.

Mobil's representatives and Valentine discussed the new franchise but failed to reach agreement. On May 25, 1983, Mobil sent Valentine a nonrenewal notice that complied with the PMPA's notice requirements. *See* 15 U.S.C. § 2804.

Valentine sued claiming that the PMPA required Mobil to offer to sell him the station at a fair price before it could end the franchise relationship. Mobil counterclaimed seeking a declaratory judgment that it had complied with the PMPA. On November 9, 1984, 614 F.Supp. 33, the district court granted Mobil's motion for summary judgment. The court found no issues of material fact in dispute and ruled that Mobil's failure to renew the franchise did not violate the PMPA.

### Appellant's Contentions

Valentine argues that the PMPA does not allow Mobil to materially restructure the business at the time of renewal. Under appellant's reading of the statute, if Mobil wishes to make such changes—for example by removing the service bays and turning the station into a pumper—it must first offer to sell him the business pursuant to 15 U.S.C. § 2802(b)(3)(D). This subsection provides that if the franchisor does not wish to renew the franchise because it has determined to materially alter, add to or sell the premises, it may decline to renew only after giving the franchisee an opportunity to buy the station. Valentine argues that the proposed redevelopment rider is tantamount to material alteration of the premises because it gives Mobil the right to do precisely that. Under the district court's interpretation, Valentine complains, Mobil can short-circuit the protections of the PMPA by forcing a dealer to accept the redevelopment rider on pain of losing the franchise.

---

1. Because the case was resolved by the district court on Mobil's motion for summary judg-ment, we view the record in the light most favorable to Valentine.

## Discussion [2]

### I.

The logic of Valentine's position stands or falls on his contention that the PMPA entitles him to buy the station if Mobil proposes to materially alter the premises. If the statute affords Valentine this right, Mobil is precluded from ending the franchise relationship in response to Valentine's refusal to authorize such changes. On the other hand, if the PMPA does not circumscribe Mobil's right to make substantial alterations, Valentine was not entitled to refuse the redevelopment rider and Mobil was within its rights in declining to renew the franchise relationship.

Our review of the PMPA discloses no provision giving Valentine the right he asserts. The Act, passed in 1978, responded to a widespread perception that the petroleum marketing industry was undergoing drastic changes, with a trend toward fewer stations, many of them pumpers.[3] Congress sought to correct what it perceived as an inequality in bargaining power between distributors of petroleum products and their franchisees by giving franchisees certain protections from arbitrary termination or nonrenewal. S.Rep. No. 731, 95th Cong., 2d Sess. 18, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 877 [hereinafter cited as S.Rep.]; *see Baldauf v. Amoco Oil Co.,* 553 F.Supp. 408, 412 (W.D. Mich.1981), *aff'd,* 700 F.2d 326 (6th Cir. 1983); *see generally Humboldt Oil Co. v. Exxon Co., U.S.A.,* 695 F.2d 386 (9th Cir. 1982). A product of compromise,[4] the PMPA affords franchisees important but limited procedural rights, while allowing franchisors significant latitude in responding to changing market conditions. *See Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1223 (7th Cir.1982).

The portion of the PMPA dealing with protection of franchisees is Title I, codified at 15 U.S.C. §§ 2801–2806. Following definitions, contained in section 2801, section 2802 limits the grounds on which the franchisor may end the franchise relationship. Section 2803 deals with trial and interim franchises, not at issue here. Section 2804 establishes procedures for termination or nonrenewal, giving franchisees an automatic 90 and sometimes 180 days' notice. Section 2805 gives aggrieved franchisees a right of action in federal district court; if successful, they may obtain actual and exemplary damages, injunctive relief and attorney's fees. Section 2806 preempts inconsistent state laws dealing with termination and nonrenewal, except in specific, limited areas.

On their face, none of these provisions gives a dealer the right to continue operating a service station in a particular fashion, or precludes a franchisor from altering the scope or operation of the business. Valentine, however, argues that such restrictions can be inferred from the language of section 2802(b)(3)(D). This section provides that the franchisor may refuse to renew the franchise relationship if it determines in good faith to sell, alter or convert the station, but only if it first offers the dealer an opportunity to purchase the property. By its terms, however, this section addresses only the situation where the franchisor wishes to terminate the franchise relationship; it does not address this case, where

---

**2.** The district court properly asserted jurisdiction pursuant to 15 U.S.C. § 2805. We have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291, a timely notice of appeal having been filed on May 8, 1985. The district court's grant of summary judgment is a determination of law reviewed by this court de novo. *Nevada v. United States,* 731 F.2d 633, 635 (9th Cir.1984).

**3.** This trend was well documented by government and industry analysts. *See, e.g., Petroleum Marketing Practices Act, 1977: Hearing on S. 19; S. 743; and H.R. 130 Before the Subcomm. on Energy Conservation and Regulation of the Senate Comm. on Energy and Natural Resources,*

No. 61, 95th Cong., 1st Sess. 243 (1977) [hereinafter cited as *Hearing*] (statement of Owen M. Johnson, Jr., Director, Bureau of Competition, Federal Trade Commission); *id.* at 130 (Office of Regulatory Programs, Federal Energy Administration, An Analysis of the Relative Competitive Position of Marketers of Motor Gasoline); *id.* at 345 (statement by Marathon Oil Company).

**4.** *See Hearing* at 326–27 (Statement of Chevron, U.S.A., Inc.); *id.* at 169 (statement of Charles Matties, President, National Congress of Petroleum Retailers).

Mobil reserves the right to convert the station but wishes to retain Valentine as a franchisee.

█ The PMPA plainly contemplates that franchisors will have substantial flexibility in changing the terms of a franchise upon renewal. *Baldauf*, 553 F.Supp. at 415; *see Veracka v. Shell Oil Co.*, 655 F.2d 445, 448 (1st Cir.1981), *cited with approval in Humboldt*, 695 F.2d at 388. Thus, section 2801 defines two separate concepts: the "franchise," consisting of a specific contract between a franchisor and a franchisee, 15 U.S.C. § 2801(1); and the "franchise relationship," consisting of the mutual obligations and responsibilities between the parties arising from the marketing of motor fuel under a franchise. *Id.* § 2801(2).[5] Under the PMPA, the franchisor has (absent specific cause) an obligation to renew only the franchise relationship, *not* the particular franchise.[6] Indeed, section 2802(b)(3)(A) contemplates the possibility of material changes in the terms of the franchise, allowing the franchisor to end the relationship if agreement cannot be reached with respect to such changes.

█ This reading of section 2802(b)(3)(A) does not, as Valentine suggests, vitiate the protections Congress intended franchisees to have under the PMPA. Franchisors may not insist on arbitrary or pretextual franchise terms. *Baldauf*, 553 F.Supp. at 412. Any changes must be proposed by the franchisor on the basis of determinations made in good faith, in the normal course of business and not for the purpose of preventing renewal of the franchise relationship. 15 U.S.C. § 2802(b)(3)(A). The PMPA gives the franchisor the burden of establishing that the proposed changes meet this standard. *Id.* § 2805(c).

Nor is Valentine correct in suggesting that the redevelopment rider gives Mobil a free hand to close up the gas station or convert it to some other type of business, forcing him out of gasoline marketing altogether. While the rider affords Mobil much flexibility in adapting the operation of the business to changing conditions, it may not go so far as to remove the gas pumps and turn the station into a parking lot. The PMPA defines both "franchise" and "franchise relationship" as arrangements involving the sale of motor fuel. 15 U.S.C. § 2801(1), (2). A decision by Mobil to cease operating the premises as a gas station would constitute a proposed termination of the franchise, triggering the protections of the PMPA. *See* 15 U.S.C. § 2802(b)(2)(E), (b)(3)(D).

█ Having determined that the statute does not on its face grant Valentine the rights he claims, we decline his invitation to look for such rights in the PMPA's penumbra in order to carry out what he suggests was Congress' unarticulated intent. Statutory language is by far the most reliable index of legislative will. 2A C. Sands, Sutherland on Statutory Construction § 46.03 (4th ed. 1984). Where, as here, the statutory language is clear and its provisions can be construed in a consistent and workable fashion, resort to legislative history to determine what may have been inchoate congressional intent is inappropriate.

█ In any event, Congress here seems to have known precisely what it was doing. It affirmatively declined to give franchisees more elaborate protections because of concern that this might unduly interfere with the franchisors' property rights, possibly amounting to an unconstitutional taking. S.Rep. at 32, *reprinted in* 1978 U.S.

---

**5.** The Senate Report notes that the term franchise relationship "is defined to cover the broad relationship which exists between a franchisor and a franchisee by reason of the franchise agreement." S.Rep. at 30, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 888.

**6.** The Senate Report is instructive on this point: [B]ecause [title I of the Act] contemplates changes in the specific provisions of the franchise agreement at the time of renewal, the title requires renewal of the relationship be-

tween the parties as distinguished from a continuation or extension of the specific provisions of the franchise agreement. Use of the narrower term "franchise" in this context could raise unintended questions regarding the ability of the franchisor to comply with the renewal obligations of the title by offering a franchise agreement which differs in any particular from the expiring franchise.
S.Rep. at 30, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 888.

Code Cong. & Ad.News at 890–91. Congress addressed this problem by allowing the franchisor to alter the terms of the franchise at the time of renewal, and to terminate the franchise relationship if agreement could not be reached:

> In this regard, it should be noted that one ground for a non-renewal of the franchise relationship is the failure, under certain circumstances, of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise. Thus, there should be no basis for a claim of unconstitutional taking of property without compensation because the franchisor may achieve compensation for any loss of valuable contract rights through changes in contractual consideration he receives under the franchise agreement.

The contract right which it is alleged amounts to a property right, the taking of which may be prohibited by the Fifth Amendment, represents but one form of contractual consideration which the franchisor obtains under the existing franchise agreement. Thus, the flexibility, which the contractually-granted right of termination represents, comprises only part of the consideration received by the franchisor in return for the contractual obligations undertaken by him. The loss of such flexibility may be offset by other forms of consideration the franchisor may be able to obtain through renewal of the franchise relationship upon modified terms and conditions. Moreover, if the franchisor and the franchisee cannot agree on modifications of the franchise agreement, a ground for non-renewal of

the franchise relationship may exist as provided in section [2802] (b)(3)(A).
*Id.*

Congress thus viewed the franchisor's ability to change the terms of the franchise and, if agreement could not be reached, the right to end the franchise relationship, as key elements in assuring that the PMPA conforms to constitutional requirements. While not binding on the court, an effort by a coordinate branch of government to comply with constitutional strictures is entitled to substantial deference. At the very least, it suggests that Congress considered very carefully how much to interfere in this complex economic relationship; the court ought not second-guess that judgment as it stands embodied in the statutory language.

## II.

■ While we conclude that the PMPA does not prohibit the redevelopment rider, we must consider whether Mobil otherwise complied with the terms of the statute. As noted, Mobil was only entitled to decline renewal if the proposed changes were offered in good faith, in the normal course of business and not for the purpose of forcing Valentine out. 15 U.S.C. § 2802(b)(3)(A). Courts have construed this section as precluding judicial second-guessing of "the economic impact of an otherwise legitimate business decision by the franchisor. So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith." *Baldauf v. Amoco Oil Co.,* 553 F.Supp. at 412; *see also Humboldt,* 695 F.2d at 389.[7]

---

7. This construction is amply supported by the PMPA's legislative history. Congress was wary of imposing the courts' business judgment on the gasoline marketing industry, and the legislative history shows the good faith requirement was carefully framed to minimize judicial intrusion into business decisionmaking:

> [C]onsiderable debate has focused upon recognition of so-called "reasonable business judgments" of the franchisor as grounds for termination or non-renewal. This standard has not been adopted by the committee. Instead, a two-fold test has been utilized to judge certain specified determinations including that of market withdrawal.

> One test is whether the determination was made "in good faith." This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made "in the normal course of business". Under this test, the determination must have been the result of the franchisor's normal decisionmaking process. These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself.

S.Rep. at 37, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 895–96.

■ The district court carefully considered the case in light of this standard and concluded that Mobil's proposed changes to the franchise agreement "clearly coincide with practices contemplated and accepted in the legislative history." This conclusion is amply supported by the record. Upon examining the materials presented with Mobil's motion for summary judgment, including certain documents presented in camera, the court determined that Mobil included the redevelopment rider in all of its franchise agreements. Mobil's business plans disclosed that the rider was intended to help Mobil respond to changing consumer demand and an industry shift toward pumper stations.

The district court gave Valentine every opportunity to present evidence disputing Mobil's factual showing or to suggest other circumstances that might evidence bad faith or ulterior motive on Mobil's part. Valentine failed to do so, essentially conceding Mobil's factual case. The district court therefore was correct in finding that there were no disputed issues of material fact.[8] Since Mobil complied with the PMPA, the district court's conclusion that Mobil was entitled to judgment as a matter of law was clearly correct.

### Conclusion

The judgment of the district court is affirmed.

POOLE, Circuit Judge (dissenting):

I dissent. Under 15 U.S.C. § 2802(b)(3)(D), Mobil cannot materially alter the functioning and physical condition of the facility, over Valentine's objection, without offering to sell its interest in the premises. Moreover, even if 15 U.S.C. § 2802(b)(3)(A) governs, so that Mobil could insist on material alterations at the time of franchise renewal, the Redevelopment Rider makes the franchise a contract of adhesion by requiring Valentine to waive whatever protections he has under the Act.

### I.

The statutory scheme of the PMPA strikes a delicate balance between the interests of the participants in a petroleum marketing franchise relationship. *Humboldt Oil Co. v. Exxon Co., U.S.A.,* 695 F.2d 386, 388 (9th Cir.1982); *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1220 (7th Cir.1982). Congress designed the PMPA to allay three specific concerns: that franchisee independence might be undermined by the use of actual or threatened termination or nonrenewal to compel compliance with franchisor marketing policies; that gross disparity of bargaining power might result in contracts of adhesion; and that termination or nonrenewal might disrupt the reasonable expectations of the parties that the franchise relationship will be a continuing one. *Id.* at 1216; S.Rep. No. 731, 95th Cong., 2d Sess. 17–19, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 875–77.

Our task is to interpret the PMPA in light of the purposes Congress sought to serve. *See Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). We are to be guided not by a single sentence, but must look to the provisions of the whole law, and to its object and policy. *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). As remedial legislation, the PMPA must be given a liberal construction consistent with its goal of protecting the independence of franchisees. *Humboldt Oil Co.,* 695 F.2d at 389; *Brach,* 677 F.2d at 1221.

The issue before this court is whether section 2802(b)(3)(A) or section 2802(b)(3)(D) governs when a franchisee objects to a franchisor's decision to convert from a full service to a self service "pumper" station. I am persuaded that section 2802(b)(3)(D) controls because that section best balances the oil industry's interest in responding to changing market conditions with the need

---

**8.** Valentine's only argument appears to be that Mobil acted in bad faith because it understood Valentine would refuse the redevelopment rider. This does not establish bad faith, because

the decision to include the rider was made independent of Valentine's particular situation, reflecting Mobil's marketing strategy with respect to all of its dealers.

of franchisees for business continuity and stability. The franchisee's interest is important for it is his labor and industry, as well as the franchisor's name and material contributions, which make the facilities competitive and successful. If a franchisor desires to materially alter the premises, it may do so. However, if the franchisee objects, section 2802(b)(3)(D)(iii) requires that the franchisor offer to sell its interest in the facility, thereby giving the franchisee the opportunity to preserve his business.

Contrary to the majority's assumption, a material alteration of the premises is not identical to a change or addition to the franchise terms. The majority characterizes the Redevelopment Rider as merely a change in the franchise. However, the Redevelopment Rider would permit Mobil to make "a substantial redevelopment of the premises" at its sole discretion. Conversion to a self-service station constitutes a determination to materially alter both the physical premises and the nature of the business. *Gardner v. Utah Oil*, No. 84–402–RE, slip op. at 6 (D.Or. Oct. 12, 1984). Mobil cannot circumvent the offer of sale requirements of section 2802(b)(3)(D) by offering Valentine a franchise only to pump gas at materially altered premises. *Gardner*, slip op. at 7.

The majority reasons that the protections of section 2802(b)(3)(D) apply only where a franchisor wants to terminate the franchise relationship, and that section 2802(b)(3)(A) applies here because Mobil offered to renew. Majority Opinion at 1390. This conclusion is based on the district court's opinion in *Baldauf v. Amoco Oil Co.*, 553 F.Supp. 408, 414 (W.D.Mich.1981), *aff'd*, 700 F.2d 326 (6th Cir.1983). However, both subparagraphs (A) and (D) are modified by the language in section 2802(b)(3) that "the following are grounds for non-renewal of a franchise relationship." The statute does not provide that subparagraph (A) governs where the franchisor offers to renew and that subparagraph (D) applies only where the franchisor decides not to renew.

According to the majority, the franchisor can materially change the premises as long as it continues marketing motor fuel, and only need offer to renew the franchise relationship to avoid the requirements of section 2802(b)(3)(D). In other words, if Mobil asks Valentine to operate the altered premises, Valentine has no right to object and purchase Mobil's interest. But if Mobil does not want Valentine to operate the business after alterations are made, Mobil must offer to sell and Valentine has an opportunity to continue operating his business. This position is not only illogical, it ignores the fact that the PMPA *requires* franchisors to offer renewal of the franchise relationship in conjunction with plans to make material alterations. 15 U.S.C. § 2802(b)(3)(D)(ii) (franchisor cannot use decision to make material alterations as an excuse to change management of premises).

The distinction made by the majority between subparagraphs (A) and (D) vitiates the protections provided to franchisees by the PMPA and places the entire economic burden for the franchisor's decision to respond to changing market conditions on the franchisee. The majority holds that as long as the franchisor offers to renew the franchise relationship, the premises can be altered in any way. The franchisor need only describe the planned changes in the contract, or include a "Redevelopment Rider" requiring the franchisee to give advance approval to any alterations the franchisor may desire. This interpretation, that section 2802(b)(3)(A) governs conversion to a self-service station, allows franchisors to circumvent the protections in a related section of the PMPA and should be rejected. *See Brach*, 677 F.2d at 1221.

The relevant inquiry in distinguishing the applicability of subparagraphs (A) and (D) is not whether the franchisor makes an offer of renewal, but whether the franchisor proposes to modify typical franchise terms or to materially alter the condition of the premises. If the parties cannot agree on reasonable changes to the terms of the franchise, such as the rent or hours of operation, the franchisor has grounds for

nonrenewal under subparagraph (A) and need not offer to sell its interest.[1] However, if the franchisor desires to convert to a self-service station by making material alterations to the premises, this triggers subparagraph (D), including the offer of sale requirements.

The majority concludes that Congress did not give franchisees more elaborate protections under the PMPA because of concern that this might unduly interfere with the franchisors' property rights. Majority Opinion at 1391–1392.[2] However, franchisor property rights are fully protected by the offer of sale requirements of section 2802(b)(3)(D). If the parties cannot agree on material alterations and the franchisor is required to make an offer of sale, the franchisor will be fully compensated for its interest in the premises if the franchisee elects to purchase. The franchisor can develop a new facility elsewhere, incorporating the desired material alterations, while the franchisee's existing business interest is preserved.

## II.

The Redevelopment Rider requires Valentine to give Mobil, at the time of franchise renewal, discretionary power to substantially alter the premises. In effect, the Rider forces Valentine to waive whatever protections are provided to franchisees by the PMPA. Thus, the Redevelopment Rider makes the franchise a contract of adhesion and cannot be a change in the franchise proposed in good faith.

If section 2802(b)(3)(D) applies when a franchisor proposes conversion to a self-service station, the Redevelopment Rider requires Valentine to waive the offer of sale protections because he will not have the opportunity to purchase Mobil's interest if he objects to alterations implemented during the franchise term. But even under the majority's interpretation of the PMPA, the Redevelopment Rider requires Valentine to waive the protections of section 2802(b)(3)(A).

Assuming that Mobil has the right to materially alter the premises at the time of franchise renewal, the majority opinion holds that failure to agree on such changes is grounds for nonrenewal under section 2802(b)(3)(A). Majority Opinion at 1391. However, here Mobil wants to continue the existing operation at the time of renewal, while getting Valentine's consent to allow it to make changes later. Once Mobil decides to implement material alterations, Valentine would have no power to disagree, even if it meant Mobil will not elect renewal and he will be out of business. The Redevelopment Rider forces Valentine to operate whatever facility Mobil desires. Because Valentine will be locked into the franchise relationship despite any objections he may have to changes made by Mobil, the Redevelopment Rider makes the franchise a contract of adhesion.

Congress was concerned with contracts of adhesion unilaterally imposed on reluctant dealers by distributors, *Baldauf*, 553 F.Supp. at 409, and enacted the PMPA to increase the bargaining strength of individual franchisees. *Halder v. Standard Oil Co.*, 642 F.2d 107, 109–110 (5th Cir.1981). However, the Redevelopment Rider gives

---

1. It is instructive to note that if the franchise relationship will likely be "uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee," the franchisor must offer to sell its interest in the premises to have grounds for nonrenewal. 15 U.S.C. § 2802(b)(3)(D)(i)(IV). This provision mirrors the language in section 2802(b)(3)(A) concerning "changes or additions" to the franchise and shows that "material alteration of the premises" is a distinct concept.

2. The legislative history cited by the majority to support the proposition that Congress allowed

franchisors wide latitude to alter the terms of a franchise is taken from a discussion which is totally irrelevant to Valentine's situation. The language in the Senate Report, Majority Opinion at 1391–1392, concerns the potential "takings" problem if the "termination" provisions of the PMPA were applied to existing franchises. Congress may have protected franchisors by applying the broader "nonrenewal" provisions where an existing franchise contained termination rights, but the flexibility given to franchisors in this context does not relate to the issue before this court.

Mobil total discretion and eliminates whatever bargaining power Valentine might have to negotiate proposed alterations at the time of franchise renewal. This result is contrary to the intent of the PMPA to correct what Congress "perceived as an inequality in bargaining power between distributors of petroleum products and their franchisees." Majority Opinion at 1390.

Section 2802(b)(3)(A) requires that the franchisor propose changes or additions to the franchise in good faith. The majority concludes that Mobil has satisfied the good faith requirement because the Redevelopment Rider is included in all its franchise agreements and is intended to help Mobil respond to changing consumer preferences. Majority Opinion at 1393. However, a franchisor cannot in good faith compel a franchisee to give up rights under the PMPA. Therefore, even if Mobil could insist on material alterations at the time of franchise renewal, the open-ended Redevelopment Rider does not meet the good faith requirements of section 2802(b)(3)(A).

Valentine has operated a full-service station at the same location for ten years, and his business has generated substantial goodwill in the community. He has invested over $50,000 in a "back room" operation which accounts for approximately one-half of his income. If the PMPA grants franchisees any protection from overbearing franchisors, it is inconceivable that Valentine can be required to sign a franchise agreement that grants Mobil an unfettered right to substantially redevelop the premises.

I cannot accept the majority's casting of the franchise relationship and hence enter this dissent.