**Bill SANDLIN, Plaintiff–Appellee,**

v.

**TEXACO REFINING AND MARKETING INC., Defendant–Appellant.**

Nos. 88–1764, 88–1874.

United States Court of Appeals,
Tenth Circuit.

April 6, 1990.

Rehearing Denied May 16, 1990.

George D. Davis (Robert D. Tomlinson and David W. Kirk on the briefs) of McKinney, Stringer & Webster, P.C., Oklahoma City, Okl., for plaintiff-appellee.

G. Kenneth Handley of Texaco Inc., White Plains, N.Y., (Terri J. Frank of Texaco Inc., White Plains, N.Y., R. Steven Haught of Daugherty, Bradford, Fowler & Moss, Oklahoma City, Okl., and Thomas J. Goodwin, Houston Tex., with him on the briefs), for defendant-appellant.

Before MOORE, BRORBY, and EBEL, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

Texaco Refining and Marketing Inc., (TRMI) appeals an adverse judgment entered for violation of the Petroleum Marketing Practices Act (PMPA) and for state breach of contract claims. TRMI contends the jury verdict is not supported by the evidence, and the trial court erred in denying its motions for directed verdict, judgment notwithstanding the verdict, and for a new trial. TRMI also appeals the trial court's award of attorney fees to the plaintiff. We reverse.

The nonrenewal at issue here was spawned by the 1984 merger of Texaco Inc. and Getty Oil Company. As a result, TRMI acquired a service station bearing the Getty name across the street from its existing Texaco station which was operated by its franchisee, Mr. Bill Sandlin, under a three-year franchise agreement with TRMI. In reviewing the merger, the Federal Trade Commission required both Texaco and Getty to divest themselves of certain assets, including the use of the Getty name. (R. II, 164–69). Consequently, the Getty station was rebranded and began doing business under the Texaco name in July 1985. (R. II, 171).

In January 1986, TRMI notified Mr. Sandlin under § 2802(b)(3)(D)(i)(III) it would not renew the franchise because it decided to sell the leased premises "in good faith and in the normal course of business." Soon after, TRMI sent a written offer to sell the property for $216,000.

At trial, Mr. Sandlin, alleging TRMI violated the PMPA and breached its duty of good faith and fair dealing implied in the contract, sought to prove that TRMI's substantive decision to nonrenew was not made in good faith and in the normal course of business, and its offer to sell the station was not bona fide. Throughout, evidence probative of statutory "good faith" was intermingled with evidence of whether the offer of sale was bona fide and the contract was performed in good faith. However, when the evidence is properly aligned under the PMPA, there is neither factual nor inferential basis on which the jury could properly find a verdict for Mr. Sandlin on his claim that TRMI violated the PMPA.

Resolution of the issues before this court brings into focus the purposes behind the statute with which we deal. The PMPA generally prohibits the arbitrary and discriminatory termination or nonrenewal of a franchise. It further enacts certain remedial provisions to protect the franchisee from any harm resulting from nonrenewal. Under the statutory scheme, nonrenewal is neither prohibited nor punished. Instead, nonrenewal is permitted if, after proper notification, the franchisor tethers the decision to one of the statutorily permitted grounds for termination. 15 U.S.C. § 2802. Additionally, under 15 U.S.C. § 2802(b)(3)(D)(i)(III), Congress imposed a

duty on a franchisor, whose nonrenewal of the franchise relationship is grounded on the decision to sell the marketing premises, to make "a bona fide offer to sell ... to the franchisee such franchisor's interests in such premises...." 15 U.S.C. § 2802(b)(3)(D)(iii)(I). To vitiate a claim under this subsection, TRMI has the "burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted," 15 U.S.C. § 2805(c), and satisfied its statutory duty to make a bona fide offer to sell.

■ It is essential to recall Congress did not intend to intrude courts into the marketplace by permitting "judicial second-guessing of the economic decisions of franchisors." *Svela v. Union Oil Co. of Calif.*, 807 F.2d 1494, 1501 (9th Cir.1987). While Congress intended the good faith test to prevent franchisors from shielding their decisions with artifice, the normal course of business element examines whether the franchisor made the choice through its usual decision-making process. "The legislative history of the PMPA indicates that courts should look to the franchisor's intent rather than to the effect of his actions, making [the good faith test] a subjective test." *Svela*, 807 F.2d at 1501 (citation omitted). However, we use an objective test to decide whether an offer is bona fide. *See Slatky v. Amoco Oil Co.*, 830 F.2d 476 (3d Cir.1987).

> The "good faith and normal course of business" requirement is essentially a procedural direction to the courts about how to judge whether the distributor has abided by the substantive restrictions and failed to renew only because of one of the statutorily permitted reasons. Thus, what the court decides in a challenge to a non-renewal is not whether the distributor determined not to renew according to some elusive notion of good faith but whether it sincerely made a decision to sell the property or to alter it or to accomplish some other business purpose permitted under the statute.

*Id.* at 482.

## I.

■ The first question presented is whether the totality of the evidence supports the verdict that TRMI's decision not to renew its franchise was not made in good faith and in the normal course of business as required by PMPA. We also consider whether the evidence supports the verdict that an offer by TRMI to sell its station to Mr. Sandlin was not bona fide. We find no evidence in support of either proposition.

We arrive at this conclusion after undertaking an analysis of the two facets that comprise a claim for violation of the PMPA. The initial inquiry, whether the franchisor made the substantive decision in good faith and the normal course of business, tests the honest commercial judgment of the franchisor. In contrast, the second evaluates whether the franchisor fulfilled its remedial obligation to the franchisee by making a bona fide offer to sell the premises. Whether this subsequent offer is bona fide questions the fairness of the franchisor's treatment of the franchisee measured by an objective standard. "The bona fide offer provision therefore serves as a second, and distinct, layer of protection, assuring the franchisee an opportunity to continue to earn a livelihood from the property while permitting the distributor to end the franchise relationship." *Id.* at 484.

Thus, two separate inquiries must flow from a PMPA test of a nonrenewal decision. Evidence of the first is not evidence of the second, not only because the two inquiries are temporally separated but also because the standards for judging both differ.

TRMI presented evidence of management's procedure of reviewing its stations in general and these two competing stations in particular. In addition, TRMI set forth its procedure for appraising the property and the circumstances of the offer made to Mr. Sandlin.

In contrast, Mr. Sandlin sought to prove that TRMI treated him unfairly and that its decision to acquire the Getty station was motivated by its desire to profit from his success in building up his business and

good will in that location.[1] To that end, Mr. Sandlin related his expectations of remaining in business "if I did good," (R. II, 105), and various promises or proposed alternatives and commitments that TRMI agents made prior to the decision to sell and the formal notice of that decision.

Intertwined in this testimony of TRMI's intent was evidence of TRMI's offer to sell. While a franchisor could make a bona fide offer to sell the premises, it is possible that the underlying decision to sell was not made in good faith and in the normal course of business. Since the statute imposes two tests to support a valid nonrenewal, a bona fide offer alone is not sufficient to cure an otherwise arbitrary nonrenewal decision. Care must be taken not to use the evidence relevant to one test as evidence applicable to the other.

When the record is viewed with that distinction in mind, there is no evidence to be found from which the jury could conclude that TRMI's written offer to sell the premises for $216,000 was not bona fide. First, plaintiff's Exhibit 6 details appraisals of the property ranging from $200,000 to $233,535.[2] Second, the $216,000 price included the tanks, lines, and equipment; $200,000 for the land, $16,000 for the additions.[3] Finally, after Mr. Sandlin refused the offer, TRMI received an offer of $260,-000 from another entity, which subsequently lapsed when the offeror was itself sold. Thereafter, TRMI listed the property for $260,000, and that listing was in effect at the time of trial.

No matter how the evidence is viewed, the $216,000 offer remains objectively reasonable as a reflection of fair market value. "That, by definition, is the highest price a willing buyer would pay, and an offer at fair market value protects the franchisee's reasonable expectation of being able to make a living with the franchise property." *Slatky*, 830 F.2d at 484. Congress intended no more. "Congress treated the bona fide offer requirement not as a statutory recognition of a business judgment but as a form of compensation to the franchisee for the harm resulting from the distributor's valid business judgment." *Id.* at 481–82.

■■■■ Similarly, Mr. Sandlin's self-serving testimony that he expected to stay in business for ten years, cannot substitute for the PMPA's provisions for the nonrenewal decision. (*See* R. II, 107). The PMPA does not protect that kind of hope or speculation. Instead, the PMPA attempts to balance the franchisee's "reasonable expectations" with the franchisor's le-

---

**1.** Reappearing in this testimony is the alleged but denied statement, "to hell with Sandlin," made by a top TRMI management official responsible for the decision to sell. Even if the *statement referred to* TRMI's decision to sell, which is questionable, it is difficult to see how that decision, under all the circumstances of this case, is premised on the franchisor's spite. Indeed, the purported statement is irrelevant to the inquiry of whether the decision is grounded in TRMI's honest commercial judgment. When faced with the FTC ruling, TRMI clearly had to dispose of one of the two stations. The remaining question, then, is whether the choice of the Sandlin station was grounded in commercial judgment or predicated upon an impermissible ground. Given the evidence which established the superior profitability of the former Getty station, TRMI established a sound commercial reason for the decision not to renew. The alleged statement simply did not controvert this reason.

**2.** A suggestion abounds that appraisals ranged from $97,000 to $233,000. Plaintiff's Exhibit 6, a copy of TRMI's internal real estate analysis, lists outside appraisals of $200,000 (12/84) and $210,000 (8/84) without the tanks and equipment; and $223,535 (12/84) and $233,535 (8/84) with the tanks and equipment. The $97,-422 figure in Exhibit 6 represents "cost less reserves (6/85)." *That figure cannot be an appraisal of value* because, in the absence of explanatory evidence, the statement "cost less reserves" must be taken at face value. Thus, the figure of $97,422 cannot represent an appraised value of the station.

**3.** An oral offer or "proposal" to sell the premises made to Mr. Sandlin in May 1985 for $269,000 would not qualify as an offer to sell under the PMPA because it predated formal notice. That offer, according to then existing company policy, did not include the underground tanks and lines although the company offered to decrease the price by half of the cost of installing new equipment if the existing equipment was defective. (R. II, 277). However, a TRMI witness testified that company policy changed, permitting Mr. Sandlin to purchase the equipment if it *passed leakage and tightness tests.* (R. II, 278).

gitimate business reasons. *Id.* at 484. That the nonrenewal at issue has the effect of altering those expectations alone cannot taint TRMI's action.[4] "So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith." *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1392 (9th Cir. 1986) (PMPA does not entitle franchisee to buy station if franchisor proposes material alteration of the premises which franchisee opposes). Recognizing the standard of review which guides the court's analysis,[5] we must conclude no evidence or reasonable inferences from the evidence can shore up the jury's verdict.

## II.

■ Mr. Sandlin also recovered a judgment on state claims under theories of breach of contract. TRMI argued in the trial court that the state claims were preempted by PMPA, but that argument has not been asserted on appeal.[6]

Except for some self-serving speculation by Mr. Sandlin,[7] we find no evidence in the record indicating TRMI breached the franchise agreement by bad faith or unfair dealing. In support of his claim that TRMI breached the good faith covenant inherent in every contract, *see Hall v. Farmers Ins. Exch.*, 713 P.2d 1027, 1029–31 (Okla.1985); *Christian v. American Home Assurance Co.*, 577 P.2d 899, 904 (Okla.1977), Mr. Sandlin refers to the testimony of one witness who stated the rebranding of the Getty station took place earlier than necessary. He also contends TRMI marketed its gas at less than it charged him and that it took an "unconscientious" advantage of him through a "technicality" in the law. Unfortunately for Mr. Sandlin's cause, this "evidence" fails to rise above mere speculation.

The events Mr. Sandlin perceived as harmful to him were nothing more than the consequence of the Getty–Texaco merger which ultimately put TRMI in the posture of competition with its own franchisee. That competition is not the substance of a state breach of contract claim, even if such a claim is not preempted by PMPA, because Mr. Sandlin was unable to present evidence to the jury which suggests TRMI competed in bad faith.

The judgment of the district court is REVERSED and REMANDED with instructions to enter judgment in favor of TRMI on all claims.

BRORBY, Circuit Judge, dissenting.

The standards that govern our review of a jury verdict are strict. We "may not weigh the evidence, pass upon the credibility of witnesses, or substitute [our] judgment for that of the jury," *Brown v. McGraw–Edison Co.*, 736 F.2d 609, 612–13 (10th Cir.1984). We may not reverse the denial of a directed verdict or JNOV motion unless the evidence "is susceptible to no reasonable inferences which may sustain the position of the party" opposing the

---

4. For example, the Ninth Circuit affirmed a judgment for the franchisor whose nonrenewal was based on the decision to convert the station from a full-service to a fast-service facility. The court upheld the nonrenewal under the PMPA, observing "the fact that Union's proposed changes might make it difficult for Svela to remain in business and earn a profit is irrelevant to a finding of good faith." *Svela*, 807 F.2d 1494, 1501 (9th Cir.1987) (citation omitted).

5. We judge whether a motion for judgment n.o.v. should have been granted upon a de novo review of the record to determine whether a jury could properly find for the prevailing party. In performing this task, we do not weigh the evidence or pass upon the credibility of the witnesses, and we view the evidence in a light most favorable to the appellee. *Anderson v. Phillips Petroleum Co.*, 861 F.2d 631 (10th Cir. 1988); *Brown v. McGraw–Edison Co.*, 736 F.2d 609 (10th Cir.1984).

6. On the issue of preemption, *see Cason v. Texaco Inc.*, 621 F.Supp. 1518 (M.D.La.1985); *Siecko v. Amerada Hess Corp.*, 569 F.Supp. 768 (E.D.Pa. 1983).

7. For example, Mr. Sandlin stated on "certain days and certain times" he saw posted prices at TRMI's neighboring station that were lower than his purchase price. Without more, this is not evidence that TRMI set those prices intentionally to harm Mr. Sandlin or that the prices were set in an effort to take an unfair advantage of him.

motion. *Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 634 (10th Cir.1988). Nor may we reverse a trial court's denial of a new trial unless the verdict is "clearly, decidedly, or overwhelmingly against the weight of the evidence." *Brown*, 736 F.2d at 616. Judged by these tests, I cannot say the jury's verdict on either of Sandlin's claims is erroneous. Thus, I must respectfully dissent from the majority's opinion.

The effect of the majority's opinion—of its recapitulation of the evidence and its formulation of the issues and the law to be applied—is to place a disproportionate evidentiary burden on the appellee Bill Sandlin. For example, the majority state that the "first question presented is whether the *totality of the evidence* supports the verdict." Opinion at 1481 (emphasis added). I view this as an over-generalization of the applicable standards of review, which I have laid out above. It is reminiscent of a "totality of the circumstances" test, which is inappropriate here, and it suggests the majority are reweighing the evidence—a job reserved to the jury.

The majority's formulation of the federal statutory requirements also serves to place an unintended hurdle in the path of a plaintiff franchisee. As the majority correctly point out, "Congress [in the PMPA] did not intend to intrude courts into the marketplace." Opinion at 1481. In fact, Congress considered "reasonable business judgments" as a ground for nonrenewal of a franchise, but rejected it in favor of the good faith and normal course of business tests, which would "avoid judicial scrutiny of the business judgment itself." S.Rep. No. 731, 95th Cong., 2d Sess., at 37, *reprinted in* 1978 U.S.Code Cong. & Admin. News 873, 895–96. In spite of this history, the majority interpret the two statutory inquiries as "test[ing] the honest commercial judgment of the franchisor." Opinion at 1481. I cannot distinguish between the majority's "honest commercial judgment" standard and the "reasonable business judgment" test clearly rejected by Congress. Thus, in my view the majority have burdened franchisees—and the courts—with an inquiry Congress meant to avoid.

The majority also disregard certain evidence offered by Sandlin and characterize other evidence in such a way as to reduce its weight in his favor. Two examples suffice to demonstrate this problem. First, I do not view Mr. Sandlin's expectation of staying in business for ten years as simply "hope or speculation," Opinion at 1482, if viewed in light of other evidence—evidence of Sandlin's increasingly profitable business, TRMI's satisfaction with him as a franchisee, and commitments and assurances made to him by agents of TRMI. From this and other evidence, the jury could have concluded Sandlin's expectation of remaining in business for several years was reasonable and thus protected by the PMPA. *See* S.Rep. No. 731, 95th Cong., 2d Sess., at 18, 1978 U.S.Code Cong. & Admin. News at 877 ("essential" that federal legislation not "prevent fulfillment of the reasonable renewal expectations of franchisees"). Second, the majority label as "self-serving speculation" Sandlin's testimony that TRMI's retail price at the Getty station was occasionally less than TRMI's wholesale price to Sandlin. Opinion at 1483. TRMI did not specifically refute or deny this testimony. I do not view this testimony as "speculation" when Sandlin certainly possessed personal knowledge of both the price he paid TRMI for gas and the posted price at the station across the street. Belittling the significance of this testimony has a dual impact on Sandlin's case, because it is relevant to both his federal and state law claims.

Moreover, although the majority seem willing to disparage Sandlin's evidence, they offer no comment on certain evidence offered by TRMI that could, as easily, be disparaged. For instance, in attempting to establish the date by which rebranding was required, a TRMI witness testified that his only knowledge of the pertinent FTC order came from reading about it in the Wall Street Journal and being advised about it by unnamed "members of management." Tr. at 185–86. Premature rebranding of the Getty station during the term of Sandlin's franchise could have been decisive on the issue of TRMI's breach of the implied covenant of good faith and fair dealing, yet

TRMI was unable to offer any more authoritative evidence of the FTC's order. The majority acknowledge "the testimony of one witness who stated the rebranding of the Getty station took place earlier than necessary," but discard it as "self-serving speculation." Opinion at 1483. They similarly reject other testimony by Sandlin. In my opinion, this characterization of the evidence amounts to reweighing testimony and judging its credibility—exercises that lie within the exclusive province of the jury.

Because I am convinced there was evidence, albeit very thin, upon which a jury could reasonably have based verdicts for Sandlin on both of his claims, and that we may not upset those verdicts without reweighing the evidence or speculating as to the jury's deliberations, I would affirm.