68 F.3d 301
 19 Employee Benefits Cas. 1954, 95 Cal. Daily
Op. Serv. 7884,
95 Daily Journal D.A.R. 13,527,
Pens. Plan Guide P 23914F
Brenda HEARN, Plaintiff-Appellant,
v.
WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST FUND,
Defendant-Appellee.
 No. 93-55167.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 8, 1994.
Decided Oct. 6, 1995.
 
 Lawrence D. Rohlfing, Santa Fe Springs, California, for plaintiff-appellant.
 Walter R. Allan, Robert A. Gordon, Constance M. Hiatt, Pillsbury, Madison & Sutro, San Francisco, California, for defendant-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before: D.W. NELSON, BEEZER and KOZINSKI, Circuit Judges.
 KOZINSKI, Circuit Judge.
 
 
 1
 We must determine whether ERISA Sec. 205(c)(6), 29 U.S.C. Sec. 1055(c)(6), absolves a pension plan of all liability to a surviving widow after her deceased husband waived her right to benefits without obtaining her consent.I
 
 
 2
 From 1961 to 1976 (and briefly in 1986), James Hearn's employer made contributions on his behalf to the Western Conference of Teamsters Pension Plan. In 1991, Mr. Hearn applied for retirement benefits. Under ERISA, he was required to take them as a joint and survivor annuity,[1] unless he elected otherwise within the 90 days before the annuity began. See ERISA Secs. 205(a)(1), (c)(1)(A)(i), & (c)(7)(A). To waive the joint and survivor annuity, Mr. Hearn had to get his wife's written consent or establish to the satisfaction of a plan administrator that he couldn't, either because he had no wife or couldn't locate her. See ERISA Sec. 205(c)(2).[2]
 
 
 3
 Mr. Hearn got a single life annuity by falsely informing the Plan's administrator, the Western Conference of Teamsters Pension Trust Fund, that he was single. Relying on this representation and its own records (which disclosed no contrary evidence), the Trust Fund paid benefits under a single life annuity until Mr. Hearn's death.
 
 
 4
 Two months later, Brenda Hearn applied for benefits, claiming she was James Hearn's widow and hadn't consented to his waiver of the joint and survivor annuity. This turned out to be true: James and Brenda Hearn were married in 1982 and separated in 1990, but they never divorced. Mrs. Hearn didn't learn of her husband's deceit until some time around his death. The Trust Fund nonetheless denied her benefits on the ground that Mr. Hearn's election had become final when his annuity payments began.
 
 II
 
 5
 Section 205(c)(6) protects pension plans from large, unexpected liabilities that could arise when plan administrators reasonably rely on waivers of spousal benefits that turn out to be invalid. If a plan administrator satisfies its fiduciary duties in determining that a spouse's consent is valid or that such consent can't be obtained, that determination "shall be treated as valid for purposes of discharging the plan from liability to the extent of payments made pursuant to such Act." (emphasis added).
 
 
 6
 Mrs. Hearn doesn't contend the Trust Fund breached its fiduciary duty; she concedes that it reasonably relied on Mr. Hearn's representations and its own records. She argues instead that section 205(c)(6) affords pension plans only a limited discharge from liability; she therefore claims a portion of the benefits she would have received but for Mr. Hearn's deceit.
 
 
 7
 The district court granted summary judgment for the Trust Fund. Having "considered section 1055(c)(6) ..., the legislative history of ERISA, the surrounding statutory language, and the public policy supporting the stability of pension plans," CR 25 at 4, the court concluded that the statute discharged the Trust Fund of all liability. In urging us to come to the same conclusion, defendant conjures up the spectre of ERISA funds in the nine western states laid waste by huge and unanticipated claims brought by armies of unknown surviving spouses.
 
 
 8
 The Trust Fund's argument has considerable appeal, but for one small problem: the language of the statute. In order to hold that the Fund is discharged of all liability to Mrs. Hearn, we would be required to ignore the statutory language underscored above: "to the extent of payments made pursuant to such Act." Anyone who doubts this need only re-read section 205(c)(6), placing a thumb on the disputed phrase, and notice that what remains (the fund's determination "shall be treated as valid for purposes of discharging the plan from liability") is precisely the rule urged on us by the Trust Fund. Had the statute stopped with the word "liability," that would surely have resolved the issue in the Trust Fund's favor. Inconveniently, it says more. And it says it in terms nicely calculated to circumscribe the earlier language: The Trust Fund's good faith determination is treated as conclusive, but only "to the extent" the Fund has already made payments.
 
 
 9
 We may not interpret a statute so as to render some of its language superfluous; at any rate, we may not do so lightly. Where the language in question cuts back or qualifies other language that sweeps very broadly, there's a particularly strong inference that the legislature employed the qualifier to limit the more general language in some meaningful way. Our task is to read the broad language and the qualifier together to reach a sensible result. Only where a sensible result isn't reachable may we resort to the drastic step of ignoring or modifying statutory language as part of the interpretive process. See 2A Norman J. Singer, Sutherland Statutory Construction Sec. 47.37 (5th ed. 1992).
 
 
 10
 Fortunately, the statutory language here is capable of a sensible construction. Section 205 discharges the Trust Fund from liability to the extent it has made payments under the Plan. This means the Trust Fund will be liable to Mrs. Hearn only if its debt to her exceeds its overpayments to her husband. In other words, to the extent Mr. Hearn hornswoggled the Trust Fund into paying him more than he was entitled to, payments to Mrs. Hearn are suspended until the Fund is more or less where it would have been had Mr. Hearn honestly disclosed his marital status.[3]
 
 
 11
 The Trust Fund vigorously waves the twin flags of legislative history and policy in objecting to our interpretation. Admittedly, it presents an unusually compelling snippet from a Senate Report to the effect that "the plan will not be liable to the surviving spouse" if it has prudently relied on the participant spouse's declaration.[4] But legislative history--no matter how clear--can't override statutory text. Where the statute's language "can be construed in a consistent and workable fashion," Valentine v. Mobil Oil Corp., 789 F.2d 1388, 1391 (9th Cir.1986), we must put aside contrary legislative history.
 
 
 12
 The Trust Fund's policy arguments are somewhat more compelling. The Fund warns that anything less than complete immunity undermines the finality of the statutory election, and upsets the actuarial assumptions on which it has relied in making funding decisions. Requiring it to make surviving-spouse payments to Mrs. Hearn, the Trust Fund argues, amounts to reopening the beneficiaries' election period after events have shown which annuity option provides the greatest return.[5]
 
 
 13
 It's true, as the Fund suggests, that Congress was very concerned about the solvency and stability of ERISA pension plans. But Congress was also very concerned about surviving spouses. Indeed, it enacted section 205(c)(6) as part of a bill that added strict spousal consent requirements for waiver of survivor benefits. The very Senate Report on which the Trust Fund relies recommends passage of the bill "because the committee believes that a spouse should be involved in making choices with respect to retirement income on which the spouse may also rely." Senate Report at 12, reprinted in 1984 U.S.C.C.A.N. at 2558. In light of these competing concerns, section 205 works out a plausible compromise: On the one hand, it shields the Trust Fund from the risk of dual liability, i.e., paying out a single life annuity to one spouse and thereafter having to pay, without any offset, another life annuity to a previously unknown surviving spouse.[6] On the other hand, the rights of the surviving spouse are preserved to the extent compatible with the pension plan's general fiscal integrity.
 
 
 14
 In reconciling the interests of pension plans and surviving spouses--both innocent, injured parties--Congress made each give up something. The surviving spouse loses any sums already overpaid to the deceased spouse. The pension fund's loss is subtler. Pension funds have no stake in whether beneficiaries choose single life or joint and survivor annuities; the present value of either annuity at the time payments commence is exactly the same. But this calculus is skewed if the pension fund is forced mid-stream to treat as a joint and survivor annuity what it had originally slated as a single life annuity. In that case, the pension fund pays the larger single-life payments up front, and then also winds up having to make survivor payments--as our case illustrates. The offset provision substantially mitigates this additional risk, but doesn't eliminate it.[7] In addition to the added actuarial risk, a deceived fund also loses its return on capital for overpayments made up front that may not be offset until long after the participant's death. Here, for example, Mr. Hearn and his heirs had use of an additional $188.50 per month[8] which would have earned interest for the Fund had the money remained in its investment account.
 
 
 15
 While these aren't trivial burdens, we must presume Congress considered them in passing section 205. Congress may well have concluded that cases like ours would be rare enough that they wouldn't jeopardize the fiscal integrity of ERISA trust funds. It may also have found the interest of surviving spouses sufficiently compelling to warrant placing some of the burden of a participant spouse's deception on the pension fund. This result is not only sensible and consistent with the statutory language, it is also fair, reconciling the Trust Fund's interests with Mrs. Hearn's in a way that doesn't make either bear the full brunt of Mr. Hearn's perfidy.
 
 
 16
 Mr. Hearn received a total of $3,096 in benefits over the course of nine months. Had he selected the joint and survivor annuity, he would have gotten only $1,399.50. The difference--$1,696.50--is the amount by which the Plan is discharged from liability. Had Mr. Hearn not waived the joint and survivor annuity, Mrs. Hearn would have been entitled to receive $78 per month beginning in October of 1991 (one month after Mr. Hearn died). The Trust Fund wasn't obligated to make payments to Mrs. Hearn until it offset the $1,696.50 it overpaid Mr. Hearn. Thus, the Trust Fund was entitled to withhold benefits from Mrs. Hearn for a period of approximately 22 months, until July of 1993. It was obligated to pay her $78 per month thereafter.[9]
 
 
 17
 * * * * * *
 
 
 18
 The judgment of the district court is REVERSED. Appellant's request for costs and attorney's fees pursuant to 29 U.S.C. Sec. 1132(g)(1) is GRANTED.
 
 
 
 [1]
 A joint and survivor annuity pays benefits to the plan participant for life and, if the participant is survived by a spouse, continues to provide benefits during the lifetime of the spouse. A single life annuity, by contrast, pays greater sums during the participant's life only
 
 
 [2]
 The section provides in part:
 Each plan shall provide that an election [to waive the joint and survivor annuity] shall not take effect unless--
 (A)(i) the spouse of the participant consents in writing to such election ... or
 (B) it is established to the satisfaction of a plan representative that the consent required under subparagraph (A) may not be obtained because there is no spouse [or] because the spouse cannot be located....
 
 
 [3]
 We say "more or less" rather than "precisely" because of the time-value of money, which we discuss below. See p. 305 infra. In nominal terms, the plan suspends payments to the surviving spouse until it has completely offset its overpayments to the deceased spouse
 
 
 [4]
 If the plan administrator acts in accordance with the fiduciary standards of ERISA in securing spousal consent or in accepting the representations of the participant that the spouse's consent cannot be obtained, then the plan will not be liable for payments to the surviving spouse. For example, if the plan administrator receives a notarized spousal consent, valid on its face, which the administrator has no reason to believe is invalid, the plan would certainly be allowed to rely on the consent even if it is, in fact, invalid
 S.Rep. No. 575, 98th Cong., 2d Sess. 14 (1984), reprinted in 1984 U.S.C.C.A.N. 2547, 2560 ("Senate Report").
 
 
 [5]
 The Trust Fund doesn't contend Mrs. Hearn colluded with Mr. Hearn to game the system. Rather, Mrs. Hearn and the Trust Fund are both victims of Mr. Hearn's deception. Accordingly, the question of equitable relief doesn't come up. We note, however, that the victim of collusion might have equitable defenses to a survivor's suit for benefits or an offsetting equitable action for unjust enrichment. In any case, plans may bring restitution actions against deceptive participants and their estates. See Naugle v. O'Connell, 833 F.2d 1391, 1397-98 (10th Cir.1987)
 
 
 [6]
 Absent section 205(c)(6), this would be a serious risk because a surviving spouse who hadn't executed a valid waiver could be entitled to benefits from the pension plan. That a plan had mistakenly overpaid one beneficiary wouldn't lessen its liability to another who was independently entitled to benefits. A trustee is liable for mistaken payments to the wrong person, even if the mistake was reasonable. See Restatement (Second) of Trusts Sec. 226. Absent section 205, the Fund would very likely have been liable to Mrs. Hearn for the full amount of her annuity
 
 
 [7]
 For instance, if a participant dies more quickly than average and is predeceased by his spouse, any fund will profit, but an undeceived fund is better off because it has been making lower payments under a joint and survivor annuity. Because the spouse predeceases, a deceived fund can't catch up by offset. Since the price of an annuity depends on weighing the chance of both gain and loss, such a lowered chance of gain makes the joint and survivor annuity more expensive for a deceived fund than for an undeceived fund
 
 
 [8]
 Mr. Hearn's benefits amounted to $344 per month. Had he selected the joint and survivor annuity, he would have been paid only $155.50 per month
 
 
 [9]
 In order to clarify the concrete effect of our ruling, we rely for our calculations on figures provided by the parties in their briefs. We don't, of course, preclude more precise calculation on remand