**Deborah S. MARSHALL, Plaintiff,**

v.

**NELSON ELECTRIC, A UNIT OF GENERAL SIGNAL, et al., Defendants.**

**No. 88–C–1213–P.**

United States District Court, N.D. Oklahoma.

June 21, 1991.

Mary Morris, Greg A. Morris, Sandra Tolliver, Morris and Morris, Tulsa, Okl., for plaintiff.

Michael J. Gibbens, Jones, Givens, Gotcher, Bogan & Hilborne, Tulsa, Okl., for defendants.

William E. Hughes, Tulsa, Okl., for Luther Noah.

ORDER GRANTING DEFENDANTS' MOTIONS FOR JNOV ON THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS JURY CLAIM, FINDINGS OF FACT AND CONCLUSIONS OF LAW ON TITLE VII NON–JURY CLAIM, AND JUDGMENT

PHILLIPS, District Judge.

## I. INTRODUCTION

Plaintiff, Deborah Marshall ("Marshall"), after being laid off by her employer, Nelson Electric, filed the instant action alleging violation of Title VII of the Civil Rights Act of 1964, and intentional infliction of emotional distress. Defendants are Nelson Electric and Luther Noah ("Noah").

Marshall alleged Noah, an employee of Nelson Electric who served as a foreman during most of Marshall's tenure there, engaged in continued sexual harassment at the workplace, and further alleged Nelson Electric ignored and acquiesced in that harassment. Marshall also alleged defendants retaliated against her because she refused to succumb to this harassment. Marshall alleged these actions constituted extreme and outrageous conduct which caused her to suffer severe physical and emotional distress.

Defendants denied Marshall's claims and asserted Marshall initiated and participated in much of the sexually-related conduct which occurred at the workplace. Defendants further asserted Marshall's layoff was not in retaliation for her actions but rather was a result of a significant economic downturn at the Tulsa location. Finally, defendants denied that any physical or emotional distress suffered by Marshall was due to any conduct of the defendants, but rather was due to conditions unrelated to Marshall's employment at Nelson Electric, including but not limited to Marshall's prior suicide attempt, physical abuse she was suffering at the hands of her husband, an extramarital affair she was having while employed at Nelson Electric, and other factors.

The intentional infliction of emotional distress claim was determined by the jury. The Title VII claim against Nelson Electric was tried to the Court. Although both claims were tried simultaneously, the Court heard some brief testimony outside the presence of the jury which pertained only to the Title VII claim.[1] At the conclusion

---

1. This testimony related to the arbitration hearing. The Arbitrator's Decision and Award contains the following pertinent findings:

 Finally, I find that there is not sufficient evidence in the record to show that sexual harassment on the part of Grievant's Supervisor played a role in selecting her for layoff. I further find that there was an admitted economic reason which justified the Company's decision to call a layoff, and because it appears that Grievant has the low seniority among Electricians in the Department, I conclude that sufficient neutral reasons have been shown to explain her selection for layoff. There is no evidence at all to show Grievant was laid off for complaining to the Company about being sexually harassed. I

of the evidence, both defendants moved for a directed verdict. The Court took these motions under advisement. On the intentional infliction of emotional distress claim, the jury awarded Marshall $2,500 compensatory damages against Noah, $93,000 compensatory damages against Nelson Electric, $2,500 punitive damages against Noah, and $62,000 punitive damages against Nelson Electric. The Court entered a partial judgment based on the jury award on October 26, 1990, and took the Title VII matter under advisement. Both defendants subsequently filed motions for judgment notwithstanding the verdict ("jnov") on the intentional infliction of emotional distress claim and filed proposed findings of fact and conclusions of law on the Title VII claim. Marshall filed a brief in opposition to defendants' motions for jnov on the emotional distress claim, and also filed proposed findings of fact and conclusions of law on the Title VII claim.

The Court grants the defendants' motions for directed verdict and jnov on the emotional distress claim, finds in favor of Nelson Electric on the Title VII claim, and renders judgment in favor of defendants.

## II. WITNESSES AND EXHIBITS

Marshall called the following witnesses at trial: Tom Birmingham, John Bell, George T. (Terry) Camp, Bill Coday, Bill Coleman, John Edwards, Randy Edwards, John Fitzgerald, Thomas Goodman, M.D., Jerry Holloman, Juanita Holloman, Jackie Howell, David Huettner, Ph.D., Charles Marshall, Deborah Marshall, Metta McGee (by deposition), Luther Noah, Wayne Schnee, Harold Wallace, and Vicki Williams.

Defendants called the following witnesses at trial: Dr. Jan Capehart, Dr. William Chop, Billy G. Coleman, Randy L. Edwards, Patricia A. McDannald, Luther Noah, Doris W. Skock, and Edward M. Wall.

The Court received into evidence numerous exhibits at trial, introduced by both plaintiff and defendant. The Court's rul-

ings on the offer of these documentary exhibits are reflected in the trial transcript.

## III. STIPULATIONS

The parties entered into the following factual stipulations:

1. Plaintiff was employed at Nelson Electric from October 4, 1976 until July 2, 1987.

2. On August 16, 1986, plaintiff was laid off from Department 411 and chose to bump into Department 710.

3. Luther Noah's employment with Nelson Electric ceased as of November 1, 1986.

4. On June 15, 1987, plaintiff voluntarily chose to be laid off from Department 710 and chose to bump into Department 411.

5. Effective July 2, 1987, plaintiff and Jackie Howell were laid off from Department 411.

6. Plaintiff filed a formal complaint of sexual harassment with the Oklahoma Human Rights Commission on December 16, 1987.

7. On September 12, 1988, plaintiff filed this lawsuit.

*See* Jury Instruction No. 3 (Oct. 18, 1990). The Court adopts these stipulations.

## IV. SUMMARY OF KEY TESTIMONY

Although numerous witnesses testified in this matter, the following testimony is pertinent to the pending motions for jnov and provides an overview of the allegations advanced by both sides.

Marshall testified that during her tenure at Nelson Electric, Noah embarked on a course of conduct that constituted sexual harassment. Marshall testified Noah referred to the women who worked for him as his "little harem"; asked Marshall if her jeans rubbed her crotch and made it wet; asked her how far or deep a man could "go inside" her; stated he wanted to marry her, wanted her to lay around the house naked and put his face in her "snatch"; and quoted repeatedly from the Bible in a way that suggested it was proper for Noah to have

conclude that Grievant was not improperly laid off on August 15, 1986.

*See* Defendant's Exhibit 18.

sex with her. He also allegedly told her that he would be very "gentle" with her and cause her to have multiple orgasms.

Marshall further testified Noah physically touched her in a variety of ways; grabbed at her; deliberately bumped into her rear and breasts; sneaked up behind her when she was bent over; and showed her pictures from Penthouse magazine. She described one occasion at work when Noah touched her between the legs and on the breast and then claimed "the devil made me do it." She also described several occasions when Noah fashioned male penises out of putty, put them in his pants, and pranced around the work area. He also allegedly threatened her job if she did not "meet with him in private." Marshall testified she never succumbed to these advances.

On cross-examination, Marshall acknowledged she also used "dirty talk" in the workplace; admitted from time to time she had asked others at work whether they had sex the night before; admitted she did not mention sexual harassment in the union grievance she pursued in connection with her layoff; conceded she was involved in an incident when Noah's pants were pulled down at work; and acknowledged that despite this alleged harassment at the hands of Noah, she repeatedly contacted Nelson Electric management after her transfer to another department asking to be transferred back into Noah's department and placed under his supervision.

One of the key witnesses called by the defense was Dr. William Chop, Marshall's treating physician. Psychiatry is an integral part of Chop's practice. Unlike other expert witnesses specifically retained to render opinions for this litigation, Chop began treating Marshall before the lawyers on both sides of this lawsuit arrived on the scene. Chop, however, was not called as a witness by Marshall. Instead, Chop was called as a defense witness by Nelson Electric.

Chop began treating Marshall on January 14, 1988, for pain, numbness and physical complaints. He last saw her on March 29, 1988. Despite the fact that Chop treated Marshall for two months, absent from Chop's testimony and medical records is any pre-litigation reference by Marshall to *sexual* harassment at her workplace. Instead, Marshall blamed her symptoms on a work-related injury that occurred in March of 1987. According to Chop, Marshall specifically attributed her weight gain problem to the worker's compensation accident. She also related to Chop a suicide attempt which resulted from her husband beating her. In Chop's opinion, it was "almost impossible" to determine the source of Marshall's many problems, including depression. Chop testified that sexual harassment was an unlikely cause of Marshall's emotional problems.

Nelson Electric's exhibit 54 contains Dr. Chop's notes, as well as several other papers. The third page of the exhibit, bearing a page no. of 499, contains Chop's notes of the oral history given by Marshall to Chop during Marshall's initial visit. There is no reference to any sexual harassment. It states in part:

> Patient presents with long, somewhat vague history of ten months of problems with pain in her neck, back and numbness extending into the arms and the hands with a very worried affect about this ... She has had a normal EMG on the left upper extremity where she has experienced most of her numbness and shooting pain a month after the initial work accident which occurred 3/2/87, where she was spun around by a machine ...

The next page of exhibit 54, bearing page no. 500, contains Chop's notes regarding Marshall's visit of January 27, 1988. There is no reference to harassment. There is mention, however, of Marshall's suicide gesture, which Chop described in part as follows:

> In addition, patient has transverse scars on the left wrist from a suicidal gesture about ten to 15 years ago that resulted when her husband was beating her quite a bit.

Dr. Chop also noted that Marshall had a "[h]istory of being abused by her current husband." The notes regarding Marshall's

visits of February 25, 1988, and March 29, 1988, are shown on pages 503 and 504 of the exhibit. There is no reference to any harassment. The only reference to any harassment in the entire exhibit is contained on pages 505–506 which is the note Marshall gave to Chop on April 5, 1988. The note, which was written for litigation purposes, states in part:

Dr. Chop my lawyer needs a copy from you, & I am also getting one from my pshyc., Dr. Farley. He needs the date in Jan. that I first came in and put me on med. & referred me to pshyc.

1. Date in Jan. temporarily disabled to work due to harassment from work & /or injury.

\* \* \* \* \* \*

My lawyer is putting me back on drawing workman's comp. again & making them pay for my pshyco. but he also needs the copy from you that started temp. disabled to work starting Jan ...

During his testimony, Chop discussed this note and his refusal to provide Marshall's attorney the information requested by Marshall because, according to Chop, he "wasn't willing to try to make this appear to be a work-related injury."

Nelson Electric's exhibit 55 contains eleven pages in Marshall's handwriting, explaining her problems. There is no reference in the exhibit to any alleged harassment. Marshall admitted during her cross-examination that she prepared this document for Dr. Chop to describe the pain that she was suffering.

## V. THE JURY'S VERDICT AND ANSWERS TO SPECIAL INTERROGATORIES

The jury was given the following instructions concerning the intentional infliction of emotional distress claim:

### Elements of Liability—Intentional Infliction of Emotional Distress

For the plaintiff, Deborah Marshall, to recover from the defendants Nelson Electric and Luther Noah on plaintiff's claim of emotional distress, you must find that plaintiff has established by a preponderance of the evidence the following essential elements:

1. A defendant intentionally injured the plaintiff, or realized that plaintiff was likely to suffer the injuries complained of, or acted with willful disregard of injuries that plaintiff might suffer;

2. A defendant's actions were extreme and outrageous taking into consideration the atmosphere and circumstances in which such actions occurred; and

3. The plaintiff suffered severe emotional distress as a direct result of a defendant's conduct. Injuries to the nervous system and mental pain are physical injuries which also qualify as severe emotional distress.

If you find plaintiff has proved each of the above elements by a preponderance of the evidence, then you must find in favor of the plaintiff.

On the other hand, if you find plaintiff has failed to prove her claim, then you must return a verdict in favor of the defendants.

*See* Jury Instruction No. 18 (Oct. 18, 1990). These are the elements of the tort of intentional infliction of emotional distress under pertinent Tenth Circuit and Oklahoma decisions. *Baker v. Weyerhaeuser Co.,* 903 F.2d 1342 (10th Cir.1990); *Guinn v. Church of Christ of Collinsville,* 775 P.2d 766 (Okla.1989); *Eddy v. Brown,* 715 P.2d 74 (Okla.1986); *Williams v. Lee Way Motor Freight, Inc.,* 688 P.2d 1294 (Okla. 1984); *Breeden v. League Services Corp.,* 575 P.2d 1374 (Okla.1978); *Floyd v. Dodson,* 692 P.2d 77, 79–80 (Okla.App.1984) (discussing Oklahoma Uniform Jury Instruction—Civil, No. 19.1).

After returning a verdict in favor of Marshall and against each defendant on this claim,[2] the jury answered a series of special interrogatories as follows:

---

**2.** As noted in the introductory section, the jury awarded plaintiff compensatory damages in the amount of $2,500 against Noah and $93,000

against Nelson Electric; and awarded plaintiff punitive damages in the amount of $2,500

**[QUESTION # 1 with JURY'S ANSWERS]**

Question 1: Was Nelson Electric's liability based in whole or in part on the following:

A. Nelson ignoring the conduct of Noah after it knew or should have known of the harassment?

Yes _X_ No ___ (check one)

B. Nelson acquiescing in the conduct of Noah after it knew or should have known of the harassment?

Yes _X_ No ___ (check one)

C. Nelson failing to take prompt action after it knew or should have known of the conduct of Noah in sexually harassing plaintiff?

Yes _X_ No ___ (check one)

D. Loaning of employees into Dept. 411?

Yes _X_ No ___ (check one)

E. Plaintiff's layoff from Dept. 411 in July, 1987?

Yes _X_ No ___ (check one)

F. Employment of other individuals in Dept. 411 after September 12, 1988?

Yes _X_ No ___ (check one)

G. Conduct of Bill Hardee in March or April 1987?

Yes _X_ No ___ (check one)

H. Conduct of Nelson Electric after September 12, 1986?

Yes _X_ No ___ (check one)

**[QUESTION # 1 continued]**

If yes, briefly describe such conduct. You may also refer to any of the above questions which you may have answered "Yes" in responding to this question. If you answer "No" to this question, fill in nothing below.

**[JURY'S ANSWER]**

It was our feeling that Nelson was not consistant [sic] with documented procedures in:

 A. Layoffs

 B. Bump Rights

 C. Recall Procedures

It was also our feeling that Nelson had limited procedures on what identified sexual harassment and no procedures on methods of employees or management to deal with this problem.

**[QUESTION # 2]**

Question 2: Focusing on your *compensatory* damage awards, why was the amount of *compensatory* damages against Noah $2,500, whereas the amount of *compensatory* damages against Nelson $93,000? Briefly explain.

**[JURY'S ANSWER]**

Noah was under employment of Nelson Electric who focused on production, not employee relations. Had proper procedures been documented for sexual harassment and correction, more of the responsibility would have fallen on Noah. Refer to Question—1A, B, C.

October 19, 1990

 /s/ Jack M. Hough

 Foreperson

*See* Special Interrogatories (Oct. 19, 1990) (emphasis in original).

VI. TO WHAT EXTENT ARE THE FINDINGS OF THE JURY WITH RESPECT TO PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM BINDING UPON THE COURT IN THE DETERMINATION OF THE NON-JURY TITLE VII CLAIM?

 When a case such as this involves both a jury trial (on the emotional distress claim) and a bench trial (on the Title VII claim) "any essential factual issues which are central to both claims must be first tried to the jury, so that the litigants' Seventh Amendment jury trial rights are not foreclosed on common factual issues." *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1443 (10th Cir.1988) (citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 472–73, 82 S.Ct. 894, 896–97, 8 L.Ed.2d 44 (1962)). "Moreover, the court is bound by the jury's determination of factual issues common to both the legal and equitable claims." *Skinner*, 859 F.2d at 1443.

 However, to the extent the essential elements of the legal and equitable claims

against Noah and $62,000 against Nelson Electric.

are not the same, the court is not bound by the jury's verdict. *Baker v. Weyerhaeuser Co.*, 903 F.2d 1342, 1345 (10th Cir.1990). For example, in a case similar to the instant case, where the plaintiff alleged both a Title VII *quid pro quo* claim and a claim for intentional infliction of emotional distress, the jury found in favor of plaintiff on the emotional distress claim and the district court found in favor of defendant on the Title VII *quid pro quo* claim. Both findings were upheld on appeal. *Snider v. Circle K Corp.*, 923 F.2d 1404 (10th Cir. 1991) (affirming the district court in part and reversing in part, on other grounds).

In the instant case Marshall asserted a Title VII hostile work environment claim and a claim for intentional infliction of emotional distress. The essential elements of each claim are set forth below.

In order to prevail on a claim for intentional infliction of emotional distress plaintiff must prove:

1. Defendant intentionally injured the plaintiff, or realized plaintiff was likely to suffer the injuries complained of, or acted with willful disregard of injuries plaintiff might suffer;

2. Defendant's actions were extreme and outrageous taking into consideration the atmosphere and circumstances in which such actions occurred; and

3. Plaintiff suffered severe emotional distress as a direct result of defendant's conduct. Injuries to the nervous system and mental pain are physical injuries which also qualify as severe emotional distress.

*Eddy v. Brown*, 715 P.2d 74 (Okla.1986); *Williams v. Lee Way Motor Freight, Inc.*, 688 P.2d 1294 (Okla.1984); *Breeden v. League Services Corp.*, 575 P.2d 1374 (Okla.1978); *Floyd v. Dodson*, 692 P.2d 77, 79–80 (Okla.App.1984) (discussing Oklahoma Uniform Jury Instruction—Civil, No. 19.1).

■ In order to prevail on a Title VII "hostile work environment" claim, plaintiff must prove:

1. Plaintiff belongs to a protected group;

2. Plaintiff was subject to unwelcome sexual harassment;

3. the harassment was based on sex;

4. the harassment affected a 'term, condition, or privilege' of employment; and

5. the employer knew or should have known of the harassment in question and failed to take proper remedial action.

*Jones v. Wesco Investments, Inc.*, 846 F.2d 1154, 1156 (8th Cir.1988). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1414 (10th Cir.1987) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)).

In the instant case the jury returned a general verdict in favor of Marshall against each defendant on Marshall's intentional infliction of emotional distress claim. Thus, the jury necessarily found Marshall proved each of the essential elements of that claim with respect to each defendant. Moreover, subsequent to receiving the jury's general verdict, the Court asked the jury to return to the deliberation room and answer a series of questions to help the Court interpret the verdict and to serve as an advisory aid to the Court on the remaining Title VII claim. The questions were prefaced with the following note from the Court: "Ladies and Gentlemen of the Jury: What follows is a series of questions known as special interrogatories. Please answer these questions to help us interpret your verdict." *See* Special Interrogatories (Oct. 19, 1990).

The jury's answers to these special interrogatories likewise constitute factual findings of the jury. Fed.R.Civ.P. 49(b); 9 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2513 at 532 (1971) (a jury's verdict, whether general, special, or by special interrogatories accompanying a general verdict, constitutes the definitive findings of fact); 5A *Moore's Federal Practice*, ¶ 49.04 at 49–58 (2d Ed.1991) (the jury's answers to special interrogatories

are the jury's "more specific findings of fact").

■ However, if the intentional infliction of emotional distress claim should not have been submitted to the jury in the first place, the jury's findings are viewed as an academic exercise, a nullity, and nothing more than advisory. Under such circumstances, the jury's factual findings would not be binding on the Court for purposes of the Title VII claim. *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1560 (11th Cir.1988) (trial court's conditional rulings concerning damages, in the event its ruling on the motion for jnov was reversed, were "advisory" only and were not binding); *Williams v. Slade*, 431 F.2d 605, 609 (5th Cir.1970) (courts have refused to grant a partial new trial on liability alone where the damages issue had been resolved in a "purely academic atmosphere"); *O'Neill v. United States*, 411 F.2d 139, 146 (3rd Cir. 1969) (trial court's conditional assessment of damages, in the event the defendant's judgment was reversed on appeal, bore the characteristic of an "advisory opinion," was "purely academic" when made, "and did not pass through the refining pressure of reality"); *Romer v. Baldwin*, 317 F.2d 919, 923 (3rd Cir.1963) (when the jury assessed damages in favor of plaintiff despite finding no liability on the part of defendant, the jury's assessment was "merely an intellectual exercise" and not binding on remand); *Swentek v. USAir, Inc.*, 830 F.2d 552, 559 (4th Cir.1987) (Seventh Amendment does not require the trial court to conform its findings to a jury verdict that is infirm); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 458, n. 4 (4th Cir. 1989).

## VII. DEFENDANTS' MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT

### A. Standard of review for motions for jnov

"Motions for directed verdict and for judgment notwithstanding the verdict are considered under the same standard." *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 498 (10th Cir.1984).[3] The standard was recently summarized by the Tenth Circuit: the test is whether there is evidence upon which the jury could properly find a verdict for the party opposing the motion for directed verdict or motion for jnov. *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir.1990). In making that determination the court "may not weigh the evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury," but rather "must view the evidence most favorably to the nonmoving party and give that party the benefit of all reasonable inferences from the evidence." *Brown v. McGraw-Edison Co.*, 736 F.2d 609, 613 (10th Cir.1984); *see also Rajala*, 919 F.2d at 615; *Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1496 (10th Cir. 1990); *Sandlin v. Texaco Refining & Mktg, Inc.*, 900 F.2d 1479, 1483 n. 5 (10th Cir.1990); *Abercrombie v. City of Catoosa, Okla.*, 896 F.2d 1228, 1231 (10th Cir.1990); *Royal College Shop, Inc. v. Northern Ins. Co. of N.Y.*, 895 F.2d 670, 677 (10th Cir. 1990); *Zimmerman v. First Fed. Sav. & Loan Ass'n*, 848 F.2d 1047, 1051 (10th Cir. 1988).

■ The district court's ruling on a motion for directed verdict or for jnov is reviewed *de novo* by the Tenth Circuit, applying the same standard as that used by the district court. *Rajala*, 919 F.2d at 615; *Sandlin*, 900 F.2d at 1483 n. 5; *Brown*, 736 F.2d at 613.

The Court notes that this standard of review has recently become somewhat blurred. The following three recent opinions of the Tenth Circuit that could be said to stand for the proposition that a ruling on a motion for directed verdict or for jnov is reviewed under a manifest abuse of discretion standard: *Snider v. Circle K Corp.*, 923 F.2d 1404, 1409 (10th Cir.1991); *Sil-*

---

**3.** Here the defendants moved for a directed verdict at the close of the plaintiff's case and again at the close of the evidence. The Court took these motions under advisement and invited jnov motions after the return of the jury's verdict in favor of plaintiff. *See Lucas v. Dover Corp.*, 857 F.2d 1397 (10th Cir.1988). The court now grants the motions for directed verdict as well as the motions for jnov.

*Flo Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1519 (10th Cir.1990); and *Key v. Liquid Energy Corp.*, 906 F.2d 500, 502 (10th Cir.1990).

In *Snider* the district court apparently denied Circle K's motion for directed verdict. On appeal the Tenth Circuit stated: "Circle K alternatively argues that the district court should not have submitted Snider's ... claim to the jury.... [W]e review the district court's decision under an abuse of discretion standard." *Snider*, 923 F.2d at 1409.

In *Key* the district court denied a motion for directed verdict and a motion for jnov. The Tenth Circuit stated: "In ruling on an appellant's request to overturn a trial court for failure to direct a verdict or grant a JNOV, the appeals court must determine whether the trial court's refusal to set aside the jury verdict constituted a manifest abuse of discretion." *Key*, 906 F.2d at 502.

Both *Snider* and *Key* cited *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1456 (10th Cir.1987), to support the "abuse of discretion" standard. However, *Karns'* "manifest abuse of discretion" language referred to the standard for reviewing a district court's ruling on a motion for new trial, not a motion for directed verdict or for jnov. *Karns*, 817 F.2d at 1456. *Key* also cited *Brown v. McGraw Edison Co.*, 736 F.2d 609, 616 (10th Cir.1984). Again, the *Brown* "abuse of discretion" language referred to the standard for reviewing a ruling on a motion for new trial. *Brown*, 736 F.2d at 616.

*Sil–Flo* reviewed the district court's denial of defendant's motion "for jnov or new trial" and used *both* standards without distinguishing between them. *Sil–Flo*, 917 F.2d at 1519. For example, the paragraph discussing the standard of review contains four sentences, each followed by a case citation. First, for its "manifest abuse of discretion" language, *Sil–Flo* cited *Harvey ex rel. Harvey v. General Motors Corp.*, 873 F.2d 1343, 1346 (10th Cir.1989). *Harvey* was a "new trial" case. Second, for its language that "so long as a reasonable basis exists for the jury's verdict, we will not disturb the trial court's ruling," *Sil–*

*Flo* cited *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1260 (10th Cir.1988). *McAlester* used the quoted language with reference to reviewing a ruling on a motion for new trial. Third, for its language that "our role is not to determine anew whether in our judgment [defendant] should have been liable on these claims," *Sil–Flo* cited *Patty Precision Prods. v. Brown & Sharpe Mfg. Co.*, 846 F.2d 1247, 1251 (10th Cir.1988). *Patty Precision* was also a "new trial" case. And fourth, for its language that "we consider only whether the evidence and all reasonable inferences to be drawn therefrom so clearly mandates that [defendant] could not be held liable that reasonable minds could not differ on this result," *Sil–Flo* cited *Ryder v. City of Topeka*, 814 F.2d 1412, 1418 (10th Cir. 1987). *Ryder* was a "jnov" case.

After carefully studying these authorities, there is no question in this Court's mind that a district court's ruling on a motion for directed verdict or for jnov is reviewed *de novo* by the appellate court, and a ruling on a motion for new trial is reviewed for manifest abuse of discretion. These two standards were clearly described by Chief Judge Holloway in *Brown v. McGraw Edison Co.*, 736 F.2d 609 (10th Cir.1984), and have been often repeated. Accordingly, this Court is convinced the three recent opinions discussed above do not properly state the law if, and to the extent, they hold a district court's ruling on a motion for directed verdict or for jnov is reviewed under an abuse of discretion standard.

B. Factual arguments directed toward sufficiency of plaintiff's evidence

Clearly, not every discrimination claim, whether it is based on age, race, national origin, or gender, automatically supports a claim for intentional infliction of emotional distress. *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 384–85 and n. 8 (10th Cir.1988). Only if the manner of discrimination is beyond all possible bounds of decency or is regarded as utterly intolerable in a civilized community may plaintiff reach the jury on an intentional inflic-

tion of emotional distress claim. *Id.* at n. 8.

■ In the instant case, defendants make two arguments that Marshall's evidence was insufficient to warrant submission of the emotional distress claim to the jury.[4] First, both defendants argue Marshall failed to introduce sufficient evidence of truly outrageous conduct on the part of Noah. Second, defendant Nelson Electric argues that because Marshall failed to introduce any evidence of outrageous conduct other than the acts of *Noah,* Nelson Electric cannot be held liable. For purposes of the instant motion, the Court accepts Marshall's testimony at face value and views it in the light most favorable to her.

In that light, the Court rejects defendants' first argument. Considering the evidence as summarized in Section IV, *supra,* the Court finds there was sufficient evidence from which the jury could find Noah engaged in extreme and outrageous conduct causing Marshall emotional distress.

■ Defendant Nelson Electric's next argument is that it cannot be liable because Marshall introduced evidence of Noah's conduct only, and failed to introduce any evidence of outrageous conduct on the part of Nelson Electric. In response, Marshall points out she advanced two theories of liability with respect to Nelson Electric: (1) that Nelson Electric is vicariously liable for the acts of Noah, under the theory of *respondeat superior,* since Noah was acting within the scope of his employment; and (2) that Nelson Electric is directly liable as a result of its own conduct in ignoring and acquiescing in Noah's conduct.

As noted earlier, there was evidence regarding how Nelson Electric responded to Noah's conduct, and the jury expressly found Nelson Electric ignored and acquiesced in Noah's conduct and failed to take prompt corrective action. Moreover, the Tenth Circuit has expressly upheld an intentional infliction of emotional distress jury award against an employer who ignored and acquiesced in the conduct of one of its employees. *Baker v. Weyerhaeuser Co.,* 903 F.2d 1342, 1347 (10th Cir.1990) ("Baker's action against Weyerhaeuser was based on Weyerhaeuser's own conduct, namely, its utter failure through its officers and supervisors to take action against [co-worker] Caldwell, a known sexual harasser of females."). Accordingly, the Court also rejects Nelson Electric's second argument.

Thus, defendants' motions for jnov are denied to the extent they argue Marshall's evidence was insufficient to submit the intentional infliction of emotional distress claim to the jury.

This, however, does not end the inquiry because at the time the Court submitted the emotional distress claim to the jury it expressly reserved ruling on the statute of limitations issue.

C. The statute of limitations issue

The Court expressed concern about the statute of limitations issue at the time the emotional distress claim was submitted to the jury. Now, after careful consideration, the Court concludes the emotional distress claim should not have been submitted to the jury.

■ The applicable statute of limitations for the claim of intentional infliction of emotional distress is two years. *Chandler v. Denton,* 741 P.2d 855 (Okla.1987). Marshall filed her complaint on September 12, 1988. Thus, absent some exception to the general rule, her claim is barred to the extent it is based on conduct that occurred before September 12, 1986.

■ Viewing Marshall's evidence in the light most favorable to her, Noah's harassment began in 1985. However, Marshall left Department 411 on August 12, 1986, and thus was no longer in the same depart-

---

4. The Court submitted the intentional infliction of emotional distress claim to the jury, but took under advisement the statute of limitations issue discussed in Section VII.C. of this order. The defendants subsequently moved for directed verdicts on the statute of limitations issue at the close of plaintiff's evidence, and for jnov on the statute of limitations issue following the return of the verdict.

ment as Noah. Marshall testified Noah's harassment "pretty much stopped" at that time, and she acknowledged Noah's conduct was less frequent and less explicit when compared to his conduct while she was in Department 411. Her testimony concerning Noah's conduct after she left Department 411 and entered Department 710 can be summarized as follows: Noah wriggled his tongue at her in a sexual way, brushed against her in the hallway, called her supervisor in Department 710 to ask where she was, watched her working, and approached her in the new department and touched her by pinching her on the arm. *See* Plaintiff's Second Proposed Findings of Fact and Conclusions of Law at 4–5 (Oct. 15, 1990).

"It is the trial court's responsibility initially to determine whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the § 46 standards. Only when it is found that reasonable [persons] would differ in an assessment of this critical issue may the ... claim be submitted to a jury." *Eddy v. Brown*, 715 P.2d 74, 76–77 (Okla. 1986). Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* at 77 (quoting Restatement of Torts (Second) § 46, comment d). To be actionable, the conduct must be beyond all possible bounds of decency in the setting in which it occurred or be regarded as utterly intolerable in a civilized community. *Id.* at 77; *Haynes v. South Community Hospital Management, Inc.*, 793 P.2d 303, 306 (Okla.App.1990); *Bostwick v. Atlas Iron Masters, Inc.*, 780 P.2d 1184, 1188 (Okla. App.1988).

Since Marshall filed her Complaint on September 12, 1988, the applicable limitations period begins on September 12, 1986. The Court finds as a matter of law the conduct that occurred after September 12, 1986, was not sufficiently extreme and outrageous to constitute intentional infliction of emotional distress. Moreover, in oral argument on this issue Marshall conceded as much.[5] However, in a good faith attempt to defuse this concession, Marshall argues Noah's conduct was a continuing tort and the Court must therefore consider all of Noah's acts, no matter how long ago they occurred, since some non-extreme/non-outrageous acts occurred after September 12, 1986.

This argument presents a difficult and close question of law. However, after careful consideration and for the reasons set forth below, the Court rejects Marshall's argument. The Court concludes that under the circumstances of this case the statute of limitations requires the Court to initially consider the conduct that occurred within the limitations period. Unless the conduct that occurred within the limitations period was sufficiently extreme and outrageous to support an intentional infliction of emotional distress claim, plaintiff's claim is time-barred.[6]

While the continuing tort doctrine has long been applied to a variety of actions, including trespass, nuisance, and false imprisonment, it has only in recent years begun to be applied to claims for intentional infliction of emotional distress.

There are no decisions from Oklahoma courts or from the Tenth Circuit on this exact issue. However, the Tenth Circuit addressed a strikingly similar issue in *Man-*

---

5. In oral argument on this issue on November 9, 1990, Marshall's counsel conceded Noah's conduct after August 12, 1986 (when she transferred into a different department) was not sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress. Marshall indirectly made the same concession in her brief. *See* Plaintiff's Brief in Response to Nelson Electric's Motion for Directed Verdict at 13–14 (Oct. 12, 1990) ("Plaintiff only testified that the harassment pretty much stopped after she left Department 411 because the conduct by Noah was less frequent and less

explicit when compared to his conduct in the Mod Center.")

6. During the trial of the case, the Court admitted evidence of defendant's conduct *outside* the statute of limitations on the assumption the continuing tort doctrine might apply, with the understanding the matter would be reviewed at the close of the evidence. The Court also believed evidence outside the statute of limitations period would be admissible under Federal Rule of Evidence 404(b) if defendants' statute of limitations arguments were overcome.

*ders v. Oklahoma ex rel. Dept. of Mental Health,* 875 F.2d 263 (10th Cir.1989), and other jurisdictions have addressed the issue.

In *Manders,* plaintiffs raised sexual harassment claims against their supervisor under Title VII and 42 U.S.C. § 1983. The statute of limitations on a section 1983 claim is two years. Since the plaintiffs filed their complaint on May 5, 1986, the Tenth Circuit looked at the evidence concerning defendant's conduct after May 5, 1984, and found no acts or allegations sufficient to support plaintiffs' claim. The plaintiffs argued defendant Haney continued to sexually harass them after May 5, 1984, by acting vengefully in response to their rebuffs. *Manders,* 875 F.2d at 265. Plaintiffs contended Haney's vengefulness was a continuation of his earlier sexual harassment because it was intended to punish them for not acquiescing to his sexual advances. *Id.* However, the Tenth Circuit disagreed and affirmed the trial court's decision to grant summary judgment based on the statute of limitations.

Similarly, in *Koster v. Chase Manhattan Bank,* 609 F.Supp. 1191 (S.D.N.Y.1985), plaintiff sued for sex discrimination under Title VII and for intentional infliction of emotional distress. Applying the New York one-year statute of limitations for the emotional distress claim, the court held "all acts occurring before the limitations period are excluded from consideration." *Id.* at 1198. Since there was no evidence that any conduct occurring within the limitations period "in and of itself [was] sufficiently extreme, outrageous and uncivilized to be actionable," the court entered summary judgment in favor of defendant. *Id.*

The Eighth Circuit appears to take the same approach as that taken by the Tenth Circuit in *Manders* and by the district court in *Koster.* In *Gross v. United States,* 676 F.2d 295 (8th Cir.1982), a farmer sought damages for intentional infliction of emotional distress allegedly resulting from a government agency's actions to thwart plaintiff's participation in the United States Department of Agriculture's feed grain program. The Eighth Circuit held the stat-ute of limitations for the claim of intentional infliction of emotional distress "generally runs from the date of the last tortious act." *Id.* at 300. "[T]he focus should be on when the last tortious act occurred." *Id.* In *Gross* the appellate court could not determine from the record whether the last tortious act occurred within the limitations period and accordingly remanded for a determination of that issue. Although the district court had made a finding concerning an incident that occurred within the limitations period, the district court had not made clear whether the incident was an extreme and outrageous act constituting intentional infliction of emotional distress. *Id.* The Eighth Circuit stated that unless that incident constituted tortious (i.e. extreme and outrageous) conduct, plaintiff's action must be dismissed as outside the statute of limitations. *Id.* Here, there clearly was no tortious (extreme and outrageous) conduct by Noah within the two year statute of limitations.

The Ninth Circuit has taken a somewhat different approach. Applying California law, the Ninth Circuit focused on the severity of the harm done to the plaintiff, holding that a cause of action for intentional infliction of emotional distress accrues at the moment plaintiff's injury is "severe enough to constitute intentional infliction of emotional distress." *Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1292 (9th Cir.1987). Even applying this standard, however, plaintiff's intentional infliction claim arose well prior to September 12, 1986.

There are authorities apparently holding *any* continuing act that occurs within the limitations period is sufficient to bring with it all the previous acts that occurred outside the limitations period. In *Page v. United States,* 729 F.2d 818 (D.C.Cir.1984), a veteran sued the Veterans Administration for injuries allegedly resulting from being subjected to harmful drugs during a course of treatment from 1961 to 1980. The Court of Appeals held "the cause of action [based on] continuous drug treatment did not accrue, and the statutory limitations did not come into play, until the allegedly tortious conduct came to a halt in

1980." *Id.* at 823. In *Everly v. United Parcel Service, Inc.,* 1989 WL 81961 (N.D. Ill.1989) (not reported in F.Supp.), the plaintiff alleged she was subjected to years of harassment, insults and discriminatory treatment at the workplace. The district court denied defendants' motion to dismiss the action, finding the cumulative effect of the conduct stretching across the years was sufficiently outrageous to defeat the dismissal motion. On the statute of limitations issue, the court stated "the statute of limitations does not begin to run on a continuing wrong until the wrong is 'over and done with' . . . and [plaintiff's claim] is not time barred by the statute of limitations." *Id.* The court focused on the last act of the defendant, apparently without regard to whether that act was extreme and outrageous. In *Twyman v. Twyman,* 790 S.W.2d 819 (Tex.App.1990), *error granted,* No. 3–88–095–CV (Dec. 19, 1990), plaintiff sought damages for negligent infliction of emotional distress based on her husband's continued attempts, over a period of years, to have her engage in deviant sexual acts with him. The Texas appellate court stated the statute of limitations on plaintiff's claim did not begin to run "until the tortious acts [had] ceased." *Id.* at 821. Also, in *Rochon v. FBI,* 691 F.Supp. 1548 (D.D.C. 1988), involving racial discrimination claims under Title VII, 42 U.S.C. § 1985, and a claim for intentional infliction of emotional distress, the court applied the continuing tort doctrine and held the statute of limitations did not start running until the time the tortious conduct ceased. *Id.* at 1563.

The Court recognizes this legal issue is a close one. However, the Court believes it should follow the Tenth Circuit's approach in *Manders* as discussed above. Further, the Court believes the reasoning underlying the decisions in *Manders, Koster,* and *Gross* is sound. Any other result would subject defendants to never-ending liability for such claims, which could at any time be triggered by non-extreme, non-outrageous, and non-tortious acts. Merely alleging that such non-actionable conduct was an extension of actionable conduct would resurrect stale time-barred conduct. Such a result would be fundamentally foreign to the purpose of statutes of limitation.

"Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence." *Wood v. Carpenter,* 101 U.S. 135, 139, 25 L.Ed. 807 (1879). They balance "the interests in favor of protecting valid claims" against "the interests in prohibiting the prosecution of stale ones." *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 464, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975).

Once the statutory period has passed, a party can carry on its affairs with confidence that it need not worry about contingent liabilities.

> [Statutes of limitation] are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

*United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979). Courts recognize that the application of "statutes of limitation result in hardship to plaintiffs in some cases." *Steele v. United States,* 599 F.2d 823, 828 (7th Cir.1979). However, "alleviation of that hardship is a matter of policy for the Congress." *Kaltreider Const., Inc. v. United States,* 303 F.2d 366, 368–69 (3d Cir.), *cert. denied,* 371 U.S. 877, 83 S.Ct. 148, 9 L.Ed.2d 114 (1962).

> [Statutes of limitation] are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They present a public policy about the privilege to litigate.

*Chase Sec. Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628

(1945) (footnote omitted). Legislatures enact a statute of limitations to apply to all cases covered by the statute. Since the legislature is the appropriate body to make such policy decisions, the only task for the courts is to determine whether the claim is within the coverage of the statute.

Here, faced with this limited task, the Court determines that Marshall's claim is not within the coverage of the statute.

In the instant case Marshall concedes, and the Court finds as a matter of law, the alleged conduct that occurred during the two-year period immediately preceding the filing of the complaint, that is, the conduct that occurred after September 12, 1986, was not sufficiently extreme and outrageous to constitute intentional infliction of emotional distress. Because no "extreme and outrageous" conduct occurred within the statute of limitations period, and because Marshall cannot use the continuing tort doctrine to resurrect the time-barred conduct under the circumstances of this case, Marshall's claim is barred by the statute of limitations.

Accordingly, defendants' motions for directed verdict and jnov on Marshall's emotional distress claim are granted based on the two-year statute of limitations.[7]

D. If the Court's grant of jnov is incorrect as a matter of law, the Court conditionally grants defendants' motion for a new trial

Rule 50 of the Federal Rules of Civil Procedure is titled "Motion for a Directed Verdict and for Judgment Notwithstanding the Verdict." Rule 50(c)(1) provides, in pertinent part:

(c) [Motion for Judgment Notwithstanding the Verdict]: Conditional Rulings on Grant of Motion.

(1) If the motion for judgment notwithstanding the verdict ... is granted, the court shall also rule on the motion for new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial....
Fed.R.Civ.P. 50(c)(1).

The Eleventh Circuit has noted "the only conditional ruling allowed by Fed.R.Civ.P. 50 is a conditional ruling for a new trial should the trial court's grant of a motion for judgment n.o.v. be overruled." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1561 (11th Cir.1988).

As indicated previously, the statute of limitations issue in this case is a difficult and close one. Recognizing that the Court's grant of defendants' motion for judgment notwithstanding the verdict on statute of limitations grounds might be reversed on appeal given the split of authority on the statute of limitations issue, the Court next proceeds to determine whether the defendants' motion for new trial should be conditionally granted. Fed.R.Civ.P. 50(c)(1); *see also* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2537–2540 (1971 & Supp.1991).

▮ In this case, the jury found Noah's harassment was extreme and outrageous and awarded compensatory damages in the amount of $2,500 against Noah. The jury also found Nelson Electric's conduct was extreme and outrageous and awarded compensatory damages in the amount of $93,-000 against Nelson Electric. Because of the jury's varying awards of compensatory damages against Noah and Nelson Electric, and because these varying awards are so contrary to the evidence, the Court finds the jury's verdict may not stand even if the statute of limitations question was wrongly decided.

▮ Compensatory damages are meant to compensate a plaintiff for actual injuries. *Moffett v. Gene B. Glick Co.*, 621 F.Supp. 244, 288 (N.D.Ind.1985). Such damages are not intended to provide a windfall to plaintiff. *Corporate Air Fleet of Tennessee, Inc. v. Gates Learjet, Inc.*, 589 F.Supp. 1076, 1082 (M.D.Tenn.1984). Nor are they for the purpose of punishing a defendant or deterring similar conduct in

---

7. Because the intentional infliction claim should not have been submitted to the jury, the jury's findings on this claim are not binding on the Court. See Section VI, *supra.*

the future. *In Re Klotz,* 53 B.R. 148 (Bkrtcy.D.N.M.1985).

The jury explained the differing amounts of actual damages in their responses to special interrogatories. The jury believed Nelson Electric did not act consistent with its documented procedures regarding layoffs, "bump rights," and recalls. The jury also believed Nelson Electric had limited procedures concerning the identification of sexual harassment and had no procedures concerning how its employees or management personnel were to deal with the problem. The jury believed Nelson Electric focused on production rather than on employee relations. Finally, the jury stated: "Had proper procedures been documented for sexual harassment and correction, more of the responsibility would have fallen on Noah." Special Interrogatories (Oct. 19, 1990) (Jury's answer to question # 2).

While the jury clearly found fault with Nelson Electric's conduct, which conduct they punished by way of punitive damages, the varying awards of $93,000 compensatory damages against Nelson Electric and $2,500 compensatory damages against Noah are irreconcilably inconsistent and against the great weight of the evidence. *Swentek v. USAir, Inc.,* 830 F.2d 552, 559 (4th Cir.1987) (Seventh Amendment does not require the trial court to conform its findings to a jury verdict that is infirm); *see also Williams v. Cerberonics, Inc.,* 871 F.2d 452, 458, n. 4 (4th Cir.1989).

While it is, of course, impossible to determine the jury's actual intention when it awarded such drastically differing amounts of compensatory damages, it is more likely than not that the awards arose out of the jury instructions on compensatory damages, which permitted jury confusion on the issue. Although the jury instructions may not have made it clear, the injury to Marshall may not be reasonably or logically divided in the way the jury attempted to do it. The jury apparently attempted to apportion damages between the individual defendant and the deep-pocket corporate defendant. But, if defendants are liable to Marshall for tortious conduct, they are jointly and severally liable, *Bell v. Mickel-*

*son,* 710 F.2d 611 (10th Cir.1983), and the jury's attempted apportionment of compensatory damages was improper.

Accordingly, the Court conditionally grants defendants' motion for a new trial pursuant to Federal Rule of Civil Procedure 50 in the event the Court's directed verdict/jnov ruling is reversed.

## VIII. FINDINGS OF FACT ON MARSHALL'S TITLE VII CLAIM AGAINST NELSON ELECTRIC

If any finding of fact in this order should more properly be designated a conclusion of law, it is hereby deemed a conclusion of law.

### A. Stipulated Facts

1. Plaintiff was employed at Nelson Electric from October 4, 1976 until July 2, 1987.

2. On August 16, 1986, plaintiff was laid off from Department 411 and chose to bump into Department 710.

3. Luther Noah's employment with Nelson Electric ceased as of November 1, 1986.

4. On June 15, 1987, plaintiff voluntarily chose to be laid off from Department 710 and chose to bump into Department 411.

5. Effective July 2, 1987, plaintiff and Jackie Howell were laid off from Department 411.

6. Plaintiff filed a formal complaint of sexual harassment with the Oklahoma Human Rights Commission on December 16, 1987.

7. On September 12, 1988, plaintiff filed this lawsuit.

### B. Noah's conduct and Marshall's participation in the sexually charged atmosphere

1. Marshall was an employee of Nelson Electric, a Unit of General Signal Corporation, from October 4, 1976 to July 2, 1987. In 1978, Marshall transferred into the Modification ("Mod") Center of Department 411, Cast Assembly. Approximately four

women worked in the Mod Center as regular employees in 1985 and 1986. Department 636, Flame Seals or firestop putty, was added to the workload of Department 411 in the mid–80's. For all accounting and labor reports, Department 636 work was treated as part of Department 411. During the years 1985 and 1986, while employed with Nelson Electric and working in Department 411 with foreman Noah, Marshall was subjected to numerous specific instances of sexual harassment. This harassment was not made a condition of her continuing employment. She was the victim of offensive touchings by Noah and was subjected to sexual comments and innuendos by Noah.

2. Noah also subjected other women, including Juanita Holloman, to similar harassments, but of less magnitude.

3. Specifically, Noah would call Marshall up to his desk and show her pornographic pictures, read sexual acts from the Bible to her, comment about her body, tell her that he would like to do specific sexual things to her.

4. Marshall's version of the alleged harassment was seriously called into question. Moreover, sexual harassment was an unlikely source of Marshall's emotional problems. Her treating physician, Dr. Chop, credibly demonstrated this point.

(a) Chop began treating Marshall on January 14, 1988, for pain, numbness and physical complaints. He last saw her on March 29, 1988. Despite the fact the Chop treated Marshall for two months, absent from Chop's testimony and medical records is any prelitigation reference by Marshall to *sexual* harassment at her workplace. Instead, Marshall blamed her symptoms on a work-related injury that occurred in March 1987.

(b) According to Chop, Marshall specifically attributed her weight gain problem to the worker's compensation accident. She also related to Chop a suicide attempt which resulted from her husband beating her. In Chop's opinion, it was "almost impossible" to determine the source of Marshall's many problems, including depression. Chop credibly testified that sexual harassment was an unlikely cause of Marshall's emotional problems.

(c) Nelson Electric's exhibit 54 contains Dr. Chop's notes as well as several other papers. The third page of the exhibit, bearing a page number of 499, contains Chop's notes of the oral history given by Marshall to Chop during Marshall's initial visit. There is no reference to any sexual harassment. It states in part:

Patient presents with long, somewhat vague history of ten months of problems with pain in her neck, back and numbness extending into the arms and the hands with a very worried affect about this.... She has had a normal EMG on the left upper extremity where she has experienced most of her numbness and shooting pain a month after the initial work accident which occurred 3/2/87, where she was spun around by a machine....

(d) The next page of exhibit 54, bearing page number 500, contains Chop's notes regarding Marshall's visit of January 27, 1988. There is no reference to harassment. There is mention, however, of Marshall's suicide gesture, which Chop described in part as follows:

In addition, patient has transverse scars on the left wrist from a suicidal gesture about ten to 15 years ago that resulted when her husband was beating her quite a bit.

(e) Chop also noted that Marshall had a "[h]istory of being abused by her current husband." The notes regarding Marshall's visits of February 25, 1988, and March 29, 1988, are shown on pages 503 and 504 of the exhibit. There is no reference to any harassment. The only reference to any harassment in the entire exhibit is contained on pages 505–506 which is the note Marshall gave to Chop on April 5, 1988.

(f) The note, which was written for litigation purposes, states in part:

Dr. Chop my lawyer needs a copy from you, & I am also getting one from my pshyc., Dr. Farley. He needs the date in Jan. that I first came in and put me on med. & referred me to pshyc.

1. Date in Jan. temporarily disabled to work due to harassment from work & /or injury.

\* \* \* \* \* \*

My lawyer is putting me back on drawing workman's comp. again & making them pay for my pshyco. but he also needs the copy from you that started temp. disabled to work starting Jan....

During his testimony, Chop discussed this note and his refusal to provide Marshall's attorney the information requested by Marshall because, according to Chop, he "wasn't willing to try to make this appear to be a work-related injury."

(g) Nelson Electric's exhibit 55 contains eleven pages in Marshall's handwriting, explaining her problems. There is no reference in the exhibit to any alleged harassment. Marshall admitted during her cross-examination that she prepared this document for Chop to describe the pain that she was suffering.

5. Noah was a poor witness as well. His testimony was likewise impaired on cross-examination by plaintiff's counsel. Moreover, it was clear to the Court that Noah was, indeed, a "dirty old man." Unfortunately, however, many of Marshall's claims regarding Noah were exaggerated, with the Court being left to sift through the tattered remains of the credibility of these two witnesses. The Court finds that the truth is somewhere between the two versions advanced, but only as reflected in these findings. Significantly, however, the Court finds that the harassment and sexual atmosphere discussed in this Order was not made known to Nelson Electric's management until late in the game, and when it was, Nelson took proper remedial action.

6. Marshall welcomed much of Noah's conduct and did not find it offensive on many occasions. On other occasions she asked Noah to leave her alone.

7. On cross-examination, Marshall acknowledged she also used "dirty talk" in the workplace; admitted from time to time she had asked others at work whether they had sex the night before; admitted she did not mention sexual harassment in the union grievance she pursued in connection with her layoff; conceded she was involved in an incident when Noah's pants were pulled down at work; and acknowledged that despite this alleged harassment at the hands of Noah, she repeatedly contacted Nelson Electric management after her transfer to another department asking to be transferred back into Noah's department and placed under his supervision. Several other witnesses corroborated Marshall's central role in the sexually charged atmosphere of Department 411.

8. While working in Department 411, Marshall molded firestop putty, a product of Nelson Electric, into penises and figures with large genitals. These molded figures were proudly displayed by Marshall and by her co-employees in Department 411, Metta McGee, Juanita Holloman and Pat Souhrada McDannald. Marshall's co-employees testified that Marshall made many of the penises, at least as many as the other employees, and seemed to enjoy making them. This rebuts Marshall's testimony that she only made one such penis in an attempt to embarrass Noah so that he would quit making them. Marshall's rebutted testimony is rejected by the Court.

9. The Court also rejects Marshall's claim that on Friday, August 8, 1986, Noah pressured her to meet him at his church to have sex. The Court further rejects the notion that a heated argument ensued when Marshall refused, that Noah threatened to lay her off, and that in retaliation Noah informed Marshall on the next Monday that she was being laid off. The Court finds this testimony unworthy of belief.

10. Marshall was not subjected to continuous and relentless instances of sexual harassment by Noah, as she alleges, especially when viewed in light of her own conduct, the indications she gave to her co-workers regarding such conduct, the totality of circumstances and the context and environment of Department 411. Acquiescence in sexual harassment was not a condition of her continuing employment. Marshall was a leading participant, if not the leader, in the sexually charged environment, according to the credible testimony

of her co-workers, witnesses Metta McGee, Pat Sourhada, Juanita Holloman, and of Noah.

11. Noah did not keep Marshall out of Department 411 in retaliation for her refusal to have sex with him.

12. After Marshall left Department 411 and began working in Department 710, Noah did not continue to harass her. As Marshall testified, the harassment "pretty much stopped" at that time. The Court finds it stopped altogether after Marshall left Department 411.

C. Additional findings regarding liability of Nelson Electric.

1. On June 30, 1986, John Fitzgerald, the Union Shop Steward, told Bill Coleman, Human Resources Specialist for Nelson Electric, that there was a problem with "dirty talk" in Department 411 but that he believed he had solved the problem, that Coleman did not need to take any action, and that if he needed assistance from Coleman in the future he would notify Coleman.

2. As the Union Shop Steward, Fitzgerald was responsible for handling Marshall's complaints and Coleman was justified in relying upon Fitzgerald's representations that he believed he had the problem concerning "dirty talk" in Department 411 solved. Both Fitzgerald and Coleman thereafter checked the Department 411 work area on occasion and observed no problem. After June 30 and until October 20, 1986, Marshall did not complain again. Indeed, in September of 1986, after she had been laid off from Department 411 and bumped into Department 710, she filed a grievance seeking to return to Department 411. These circumstances were further indications to Nelson Electric that Marshall did not object to the environment in Department 411. On October 20, 1986, Marshall complained directly to Nelson Electric for the first time.

3. On August 16, 1986, Marshall was laid off from Department 411 solely due to economic conditions. Orders for products in the Marshall's product group decreased significantly for four to six weeks before Marshall was laid off. Labor hours in Marshall's product group also decreased at the time Marshall was laid off.

4. After her layoff from Department 411, and while Noah still worked in that department, Marshall continuously attempted to return to the department. Marshall testified at her arbitration hearing: "[I] was continuously trying to get back into Department 411."

5. Ultimately, on October 20, 1986, Marshall complained about the harassment to the President of Nelson Electric, Ivan Ellsworth, and also filed her complaint with the EEOC thereafter. Ellsworth instructed the Human Resources Department to conduct an investigation, which it did. Bill Coleman, the Human Resources Manager for Nelson Electric, took recorded statements of the employees in the Mod Center.

6. Nelson Electric took immediate action after receiving Marshall's written complaint. An investigation was conducted and Marshall's coworkers were interviewed. Upon completion of the investigation Noah was notified that he would no longer work at Nelson Electric effective November 1, 1986. After November 1, 1986, Marshall had no contact with Noah until she filed this lawsuit.

7. On July 2, 1987, Marshall and a male coworker were laid off from Department 411. Upon being notified of this layoff, Marshall read and signed a form indicating she did not wish to bump into any other position.

8. During 1986 and 1987 the non-salaried workforce at the plant where Marshall worked decreased from 198 to 115 employees. The economic downturn in Department 411 merely reflected the continuing decrease in the overall work force at Nelson Electric during these years.

9. Marshall's layoffs were accomplished pursuant to and in compliance with the terms of the Collective Bargaining Agreement.

10. Moreover, Noah was not acting within the scope of his authority as a foreman at Nelson Electric when he sexually harassed Marshall.

11. Nelson Electric had established an effective means for employees to voice complaints of harassment without having to go through the alleged harasser, and had a policy against sexual harassment.

### D. Other factual findings

1. The Court finds Marshall belongs to a protected group.

2. The Court finds Marshall was subject to unwanted sexual harassment by Noah between 1985 and August 12, 1986.

▇▇▇ 3. However, the Court also finds that although Noah was a foreman, he was not a supervisory employee within the meaning of Title VII. Thus, Nelson Electric is not automatically liable for the acts of Noah under Title VII. Rather, Nelson Electric is liable for the acts of Noah only if it knew or should have known of the harassment and failed to take appropriate remedial action.

4. The Court finds Nelson Electric, through its officers and supervisors, neither knew nor should have known of the sexual harassment by Noah until October 1986.

5. Moreover, the Court finds that once Nelson Electric was made aware of the harassment, Nelson took proper remedial action. Nelson did not ignore the conduct of Noah, nor did Nelson acquiesce in the conduct of Noah.

6. The Court finds that none of the layoffs of Marshall were due to sexual discrimination. Rather the layoffs were due solely to economic motives concerning the business turndown at Nelson Electric and/or the lack of work in Department 411.

7. The Court concludes Marshall was not laid off in retaliation for her complaint about harassment.

### IX. CONCLUSIONS OF LAW ON MARSHALL'S TITLE VII CLAIM AGAINST NELSON ELECTRIC

If any conclusion of law in this order should more properly be designated a finding of fact, it is hereby deemed a finding of fact.

▇▇▇ 1. Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The phrase "terms, conditions, or privileges of employment" encompasses the entire spectrum of disparate treatment of men and women in employment. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

2. Sexual harassment is a form of employment discrimination prohibited by Title VII. *Id.* at 65, 106 S.Ct. at 2404; *Jones v. Flagship Int'l*, 793 F.2d 714, 719 (5th Cir. 1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

3. Circuit courts have expressed their strong concern for the "menace of sexual harassment in the workplace." *See, e.g., Starrett v. Wadley*, 876 F.2d 808, 815 n. 9 (10th Cir.1989); *see also Williams v. Maremont Corp.*, 875 F.2d 1476, 1477 and 1485 (10th Cir.1989) (employer had legal right to terminate supervisory employee based in part on evidence that he pulled down his zipper and told female employee "if you want it here it is").

▇▇▇ 4. Two distinct forms of sexual harassment are actionable under Title VII: (a) quid pro quo and (b) hostile work environment. *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982). *See also Meritor*, 477 U.S. at 66, 106 S.Ct. at 2405.

5. In this case Marshall sought relief under the hostile work environment theory.

▇▇▇ 6. In order to state a prima facie case under the hostile work environment theory Marshall must prove:

 a. she belongs to a protected group;

 b. she was subject to unwelcome sexual harassment;

 c. the harassment was based on sex;

 d. the harassment affected a "term, condition, or privilege" of employment; and

e. Nelson Electric knew or should have known of the harassment in question and failed to take proper remedial action.

*Jones v. Wesco Investments, Inc.,* 846 F.2d 1154, 1156 (8th Cir.1988).

7. "[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of employment and create an abusive working environment.'" *Id.* (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). "[T]he trier of fact must determine the existence of sexual harassment in light of 'the record as a whole' and 'the totality of circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Meritor,* 477 U.S. at 69, 106 S.Ct. at 2406 (quoting 29 C.F.R. § 1604.11(b) (1985)).

8. Courts may properly resort to EEOC guidelines for guidance in sexual harassment cases. *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404.

9. Title 29 C.F.R. § 1604.11 sets forth the EEOC guidelines defining sexual harassment.

(a) Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

 \* \* \* \* \* \*

(c) Applying general Title VII principles, an employer ... is responsible for its acts and those of its *agents and supervisory employees* with respect to sexual harassment regardless of whether the specific acts complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or should have known of their occurrence. . . .

(d) With respect to conduct between *fellow employees,* an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

29 C.F.R. § 1604.11(a), (c), (d) (1988) (emphasis added).

10. In *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the United State Supreme Court rejected the standard of strict liability of an employer for sexual harassment by its supervisors in a hostile work environment claim.[8]

11. Title VII defines "employer" to include any "agent" of the employer. Thus, the determination depends on agency principles. In *Meritor,* the Supreme Court discussed the issue of employer liability for the acts of its employees, but "decline[d] to issue a definitive rule on employer liability." *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408.

The trial court in *Meritor* had determined that the bank (employer) was not liable because it did not have notice of the alleged conduct, finding that notice to the alleged harasser (who was the vice president of the bank and the manager of the branch office where the conduct occurred) was not the equivalent of notice to the bank. The Court of Appeals took the opposite view and held the bank strictly liable for the manager's conduct even though the bank did not know and could not reasonably have known of the alleged misconduct. The Court of Appeals held that "a supervisor, whether or not he possesses the authority to hire, fire, or promote, is neces-

---

**8.** Prior to *Meritor* the EEOC and some cases held the employer strictly liable for the acts of its supervisors, regardless of knowledge; other courts held that the employer was liable only if it knew or should have known of the harassment and failed to take prompt remedial action. *Henson, supra; Katz v. Dole,* 709 F.2d 251 (4th Cir.1983).

sarily an 'agent' of his employer for all Title VII purposes, since 'even the appearance' of such authority may enable him to impose himself on his subordinates." *Id.* at 70, 106 S.Ct. at 2407.

The Supreme Court rejected the strict liability view adopted by the Court of Appeals. The Supreme Court described the varying positions taken by the plaintiff, the defendant, and the EEOC (amicus curiae), but declined to adopt any of those positions. Instead, the Court said:

> We do agree that Congress wanted courts to look to agency principles for guidance in this area.... Congress' decision to define 'employer' to include any 'agent' of the employer surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible. For this reason, we hold that the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors. *See generally* Restatement (Second) of Agency §§ 219–237 (1958). For the same reason, absence of notice to an employer does not necessarily insulate that employer from liability. *Id.*

In addition, the Supreme Court rejected the view that the mere existence of a policy against discrimination and a grievance procedure coupled with the plaintiff's failure to invoke the procedure, necessarily insulates the employer. In *Meritor* the policy was a general one and did not address sexual harassment in particular; moreover, the grievance procedure required the complainant to complain first to the direct supervisor who, in this case, was the alleged harasser. *Meritor,* 477 U.S. at 72–73, 106 S.Ct. at 2408.

12. In *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1417–18 (10th Cir.1987), the Tenth Circuit described its application of the agency principles suggested by the Supreme Court in *Meritor.* The Tenth Circuit said:

> We find guidance in the Restatement (Second) of Agency § 219 (1958). Under § 219(1), an employer is liable for any tort committed by an employee 'while acting in the scope of ... employment.' *Id.* However, as one commentator noted, 'a sexual harassment simply is not within the job description of any supervisor or any other worker in any reputable business.' Thus, 'confining liability ... to situations in which a supervisor acted within the scope of his authority conceivably could lead to the ludicrous result that employers would become accountable only if they explicitly require or consciously allow their supervisors to molest women employees.'
>
> Although § 219(1) ... provides scant assistance in assessing employer liability under Title VII, § 219(2) is more helpful. In particular, § 219(2) creates employer liability when (1) the master was negligent or reckless, and (2) where the servant purported to act or to speak on behalf of the principal and there was reliance on apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

*Hicks,* 833 F.2d at 1418 (citations omitted). With those principles in mind, the Tenth Circuit remanded, noting that "Gates might be liable for the acts of sexual harassment of Gleason." *Id.* at 1418. (Gleason was a supervisor at Gates Rubber Company.)

13. The following factors, though not exclusive, are relevant to determining employer liability for its own conduct in allowing a hostile environment situation to occur:

a) notice to the employer and the employer's failure to take prompt remedial action;

b) the lack of any policy against sexual harassment;

c) the lack of an established or effective means for employees to voice complaints of harassment without having to go through the alleged harasser;

d) pervasive and long continuing harassment which would constitute constructive knowledge to the employer.

14. Unlike the quid pro quo case, a hostile work environment claim may arise from the harassing conduct of *co-employees.* Where non-supervisors are involved, the general rule is that the employer is

liable only when it has actual or constructive knowledge of the harassment and fails to take immediate and appropriate remedial action. *Baker v. Weyerhaeuser Co.*, 903 F.2d 1342 (10th Cir.1990); *Rabidue v. Osceola Refining Co.*, 805 F.2d 611 (6th Cir. 1986); *Barrett v. Omaha National Bank*, 726 F.2d 424, 427 (8th Cir.1984).

15. The Court concludes Marshall belongs to a protected group.

16. The Court concludes Marshall was subject to unwanted sexual harassment by Noah between 1985 and August 12, 1986.

17. However, the Court also concludes that although Noah was a foreman, he was not a supervisory employee within the meaning of Title VII. Thus, Nelson Electric is not automatically liable for the acts of Noah under Title VII. Rather, Nelson Electric is liable for the acts of Noah only if it knew or should have known of the harassment and failed to take appropriate remedial action.

18. The Court concludes Nelson Electric, through its officers and supervisors, neither knew nor should have known of the sexual harassment by Noah until October 1986.

19. Moreover, the Court concludes that once Nelson Electric was made aware of the harassment, Nelson took proper remedial action. Nelson did not ignore the conduct of Noah, nor did Nelson acquiesce in the conduct of Noah. Unlike *Baker v. Weyerhaeuser*, 903 F.2d 1342, 1347 (10th Cir.1990), here the employer, Nelson Electric, did not engage in an "utter failure through its officers and supervisors to take action against [co-worker] Caldwell, a known sexual harasser of females." Here, Nelson did not ignore or acquiesce in the conduct of its employee Noah. To the contrary, Nelson investigated the matter and Noah was removed.

20. The Court concludes that none of the layoffs of Marshall were due to sexual discrimination. Rather the layoffs were due solely to economic motives concerning the business turndown at Nelson Electric and the lack of work in Department 411.

21. The Court concludes Marshall was not laid off in retaliation for her complaint about harassment.

22. Marshall is not claiming in this lawsuit that her layoff from Department 411 in August, 1986, and the subsequent denials of recall to Department 411, were violations of Title VII.

23. Nelson Electric committed no acts toward Marshall which constitute sexual harassment or which created a hostile work environment, either when analyzed subjectively or objectively, in light of Marshall's own conduct and the work atmosphere in Department 411. Marshall's conduct indicates that the work environment at Nelson Electric was not offensive or unwelcome to her.

24. Nelson Electric is not responsible or liable under Title VII for the improper conduct of Noah. Nelson Electric was not negligent or reckless in handling Marshall's complaints, and Marshall has not proven that Noah, in engaging in the offensive conduct, purported to speak or act on behalf of Nelson Electric, relied upon apparent authority from Nelson Electric, or that his offensive conduct was aided by the existence of an agency relationship with Nelson Electric.

25. Marshall has not satisfied her burden of proving that a discriminatory motive played a part in her layoff on July 2, 1987.

26. Nelson Electric established a proper non-discriminatory economic motive for laying Marshall off in August, 1986 and June, 1987. Marshall has not satisfied her burden of showing that such motive was mere pretext for discrimination.

27. Marshall was laid off pursuant to the terms of the valid and binding collective bargaining agreement in effect at Nelson Electric.

28. The Arbitrator's decision rendered as a result of Marshall's grievances is entitled to substantial weight.

## X. BILL OF COSTS

Marshall filed a bill of costs to which defendants objected. In light of this Or-

**1042**

der, Marshall's bill of costs is DENIED and defendants' objections are deemed MOOT.

## XI. ATTORNEY'S FEES

 Title 42 U.S.C. § 2000e–5(k) grants the Court discretion to award attorney's fees to the prevailing party in a Title VII action and the Supreme Court has clearly defined the standard for making such an award to a prevailing defendant. A defendant is entitled to recover attorney's fees in a Title VII action only if the Court makes a finding that the action was brought in bad faith or was frivolous, unreasonable, or without foundation. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *EEOC v. St. Louis–San Francisco R.R.*, 743 F.2d 739, 744 (10th Cir.1984).

 In the instant case, the Court is not able to make such findings. The issues were both novel and complex and there were numerous close legal and factual questions. Indeed, the statute of limitations question was sufficiently close that the Court took the matter under advisement.

While counsel for both sides were contentious at times and the case was hard fought by both sides, the Court finds Marshall's Title VII action was not brought in bad faith and cannot be characterized as frivolous, unreasonable or without foundation.

Accordingly, defendants are not entitled to recover their attorney fees as the prevailing party in this matter.

## XII. JUDGMENT

A judgment in favor of defendants accompanies this Order, and is filed separately. The Court's previous partial judgment entered on October 29, 1990, in favor of Marshall on the intentional infliction of emotional distress claim is now withdrawn. The accompanying judgment represents the final judgment of this Court in this matter.

IT IS SO ORDERED.

## JUDGMENT

In accordance with the Court's order granting defendants' motions for judgment notwithstanding the verdict on plaintiff's intentional infliction of emotional distress claim, together with findings of fact and conclusions of law on plaintiff's Title VII non-jury claim, entered this same date, the Court hereby enters JUDGMENT in favor of defendants Luther Noah and Nelson Electric and against plaintiff Deborah S. Marshall on plaintiff's claim of intentional infliction of emotional distress, and JUDGMENT in favor of defendant Nelson Electric and against plaintiff Deborah S. Marshall on plaintiff's Title VII claim.